[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 14, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14047

_____

D. C. Docket No. 04-03422-CV-VEH-HGD

ROBERT BRYANT MELSON,

Petitioner-Appellant,

versus

RICHARD F. ALLEN, Commissioner,
Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(November 14, 2008)

Before BIRCH, BARKETT and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

Robert B. Melson ("Melson"), a prisoner under an Alabama death sentence, appeals the district court's dismissal of his 28 U.S.C. § 2254 federal habeas petition as untimely. Melson contends that he filed his petition within the one-year statute of limitations. Alternatively, he submits that the limitations period may be equitably tolled based on the misconduct of his post-conviction attorneys or his actual innocence. Based on our review of the record and oral arguments, we AFFIRM.

## I. BACKGROUND

In April 1994, Melson fatally shot three employees and wounded another while robbing a Popeye's restaurant in Gadsden, Alabama, with his accomplice, Cuhuatemoc Peraita ("Peraita"). See Melson v. State, 775 So. 2d 857, 864-66 (Ala. Crim. App. 1999). The crimes occurred sometime between 11:15 P.M., when the cashier left for the night, and 12:26 A.M., when Bryant Archer ("Archer") called 911. Both assailants wore bandannas over their faces. Archer recognized Peraita as one of the robbers because he was a recent former employee and had a distinctive hairstyle. Archer identified the other assailant as a black male but gave no other physical description at trial. Police officers went to Peraita's house and then followed Peraita's car when it left. At 1:20 A.M., police officers arrested Peraita and Melson, who was driving the car. Melson at first told the police that he

2

had been with Peraita the entire night up until his arrest. Two days later, Melson changed his story, claiming that Peraita dropped him off in an area called Green Pastures around 11:50 P.M. and picked him up again at 1:00 A.M. Melson said they then changed clothes at Peraita's house because they had gotten wet in the rain.

At a jury trial in April 1996, Laura Laverty ("Laverty") testified that Melson and Peraita were at her residence from 11:00 P.M. to 11:30 P.M. the night in question. Melson was wearing a University of Alabama sweatshirt, blue jeans, tennis shoes, and a hat when he left. Laverty also stated that Melson had asked her to see if Melissa King ("King") would provide him with an alibi. King testified that Melson wrote her three letters from jail asking her to provide a false alibi. In the letters, which were introduced at trial, Melson bemoaned the fact that King was not at a place called Frankie's the night of the murders but urged her to say in court that she had seen him leave there between 12:30 and 12:45 A.M.

Inside Peraita's house, authorities found a bag of money and some clothes, including a University of Alabama sweatshirt and blue jeans. Police also recovered a gun thrown into the Coosa river by Peraita's brother, Edmundo. Plaster casts of shoeprints at the scene matched one of Melson's tennis shoes that he was wearing when arrested. Melson presented one alibi witness, Tyrone Porter,

3

who testified that he saw Melson at Frankie's the night of the robbery between 11:00 P.M. and midnight (even though he had no watch).

Melson was found guilty and sentenced to death for three robbery-murder convictions, life imprisonment without the possibility of parole on a fourth capital murder conviction, forty years in prison on an attempted murder conviction, and forty years in prison on a first-degree robbery conviction. See Melson, 775 So. 2d at 863-64. Melson's convictions and sentences were affirmed on appeal by the Alabama Court of Criminal Appeals and the Alabama Supreme Court. See id. at 904; Ex Parte Melson, 775 So. 2d 904, 908 (Ala. 2000). The United States Supreme Court denied Melson's petition for writ of certiorari on 5 March 2001. Melson v. Alabama, 532 U.S. 907, 121 S. Ct. 1233 (2001).

The following timeline is relevant to the outcome of this case:[1]

| 4 Mar. 2002 | Melson, through counsel, filed an unverified Rule 32 petition, challenging his convictions. |
| 12 Mar. 2002 | The state filed a motion to dismiss on the ground that the petition was not verified, as required by Rule 32.6(a) of the Alabama Rules of Criminal Procedure. |
| 15 Mar. 2002 | The circuit court granted the state's motion to dismiss and gave Melson twenty-one days to comply with the verification requirement. |

---

[1]Unless otherwise noted, the timeline is taken from facts set forth in Melson v. State, 902 So. 2d 715, 717 (Ala. Crim. App. 2004).

4

| | |
|---|---|
| 25 Mar. 2002 | Melson, through counsel, filed an amended verified petition to comply with Rule 32.6(a). |
| 17 Oct. 2002 | The circuit court dismissed Melson's Rule 32 amended petition pursuant to Rule 32.7 because the claims: (1) failed to raise a material issue of fact or law, state a claim, and meet the specificity requirement, or (2) were procedurally barred.[2] |
| 2 Dec. 2002 | Melson, through counsel, filed a notice of appeal with the Alabama Court of Criminal Appeals. |
| 6 Dec. 2002 | Melson, through counsel, filed a notice of appeal with the Etowah Circuit Clerk. |
| 16 Dec. 2002 | The Alabama Court of Criminal Appeals issued a certificate of judgment dismissing the appeal because it was not timely filed. |
| 6 Mar. 2003 | Melson, through counsel, filed a second Rule 32 petition requesting an out-of-time appeal from the dismissal of his first Rule 32 petition. |
| 3 Apr. 2003 | The circuit court dismissed Melson's second Rule 32 petition.[3] |
| 6 Jan. 2004 | The Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of Melson's second Rule 32 petition because Melson did not state a claim upon which relief could be granted. Melson v. State, 902 So. 2d 715, 719 (Ala. Crim. App. 2004). |
| 10 Dec. 2004 | The Alabama Supreme Court denied Melson's petition for writ of certiorari as to his second Rule 32 petition.[4] |

On 13 December 2004, Melson filed this § 2254 federal habeas petition.

---

[2]R1-14, Exh. Vol. 23 at R71, p. 42.

[3]R1-14, Exh. Vol. 23 at R72.

[4]R1-14, Exh. Vol. 23 at R74.

The government filed a motion to dismiss the petition as untimely. The district court subsequently dismissed the petition. First, the court found that Melson's federal habeas petition was time-barred under 28 U.S.C. § 2244(d)(1)(A), which starts a one-year statute of limitations running from the date Melson's conviction became final. The court found that Melson's unverified Rule 32 petition filed on 4 March 2002 was not properly filed so as to toll the limitations period under § 2244(d)(2), and that the actions of Melson's post-convictions attorneys did not warrant equitable tolling. Second, the district court found that Melson's claims of newly discovered evidence filed pursuant to 28 U.S.C. § 2244(d)(1)(D) were procedurally defaulted because they were never raised in a state post-conviction proceeding. The court found no cause or prejudice to excuse the procedural default. Further, the court found that a miscarriage of justice would not occur if these procedurally defaulted claims were not considered because Melson had failed to show he was actually innocent of the crimes. Melson now appeals the district court's dismissal of his federal habeas petition.

## II. DISCUSSION

We review de novo a district court's dismissal of a federal habeas petition, including the determination that a petition is time-barred under § 2244(d). See Arthur v. Allen, 452 F.3d 1234, 1243 (11th Cir. 2006). A district court's factual

findings are reviewed for clear error.  Id.  In addition, a state court's factual findings are presumed correct unless the petitioner rebuts that presumption with clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1) (2006).

A.  Timelinesss under 28 U.S.C. § 2244(d)(1)(A)

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets a one-year statute of limitations for filing a federal habeas petition challenging a state court judgment.  See id. § 2244(d)(1) (2006).  The statute of limitations starts running on the latest of:  "(A) the date on which the judgment became final by the conclusion of direct review . . . or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  Id. § 2244(d)(1)(A), (D).  Under either trigger date, the limitations period is tolled during the time "a properly filed application for State post-conviction or other collateral review . . . is pending."  Id. § 2244(d)(2).

Melson's convictions and death sentence became final on 5 March 2001, the date the United States Supreme Court denied his certiorari petition.  Pursuant to § 2244(d)(1)(A), Melson had one year from 5 March 2001, or until 6 March 2002, in which to file a timely federal habeas petition.  Melson argues that the limitations period was tolled on 4 March 2002, the date he filed an unverified Rule 32 petition.  That petition was dismissed, however, for failing to comply with the verification

7

requirement of Rule 32.6(a) of the Alabama Rules of Criminal Procedure.  See

Melson, 902 So. 2d at 717.  Rule 32.6(a) requires a Rule 32 petition to be "verified

by the petitioner or the petitioner's attorney . . . using or following the form

accompanying this rule."  Ala. R. Crim. P. 32.6(a) (2002).  The accompanying

form reveals that a properly verified petition is a petition sworn to under oath or

penalty of perjury by the petitioner or counsel of record.  See id. app.  Accordingly,

Melson's unverified Rule 32 petition was not "properly filed" within the meaning

of § 2244(d)(2) because the petition failed to comply with Alabama's verification

requirement.  See Hurley v. Moore, 233 F.3d 1295, 1298 (11th Cir. 2000) (per

curiam) (state post-conviction motion was not "properly filed" under § 2244(d)(2)

because it failed to comply with Florida's written oath requirement).  Melson's

unverified petition thus did not trigger the tolling provisions of § 2244(d)(2) before

the limitations period ended.  See id.

Melson contends that the verification requirement is not a filing requirement

for purposes of § 2244(d)(2) because it is a non-jurisdictional defect that is subject

to waiver and is curable by amendment.  The United States Supreme Court has

rejected Melson's distinction between jurisdictional and non-jurisdictional filing

requirements, ruling that *"no matter their form"* and regardless of whether they are

"jurisdictional, an affirmative defense, or something in between," state rules which

8

establish filing conditions fall within the meaning of "properly filed" under § 2244(d)(2). <u>Allen v. Siebert</u>, 552 U.S. ___, ___, 128 S. Ct. 2, 4 (2007) (emphasis in original and quotation marks omitted) (concluding that a Rule 32 petition not filed within Alabama's statute of limitations was not "properly filed" pursuant to § 2244(d)(2)). The fact that Rule 32.6(a) is subject to waiver and is a non-jurisdictional defect "renders it no less a 'filing' requirement than a jurisdictional time bar would be; it only makes it a less stringent one." <u>Id.</u> at ___, 128 S. Ct. at 4.

Nor did Melson's amended verified petition, filed on 25 March 2002, toll the one-year limitations period. Once Melson's limitations period ended on 6 March 2002, any collateral application filed after that date had no tolling effect. <u>See Alexander v. Secretary, Dep't of Corr.</u>, 523 F.3d 1291, 1294 (11th Cir. 2008) (a state court motion for post-conviction relief cannot toll the limitations period if that period has already expired). Moreover, Melson "may not attempt to resurrect a terminated statute of limitations by subsequently filing documents that purport to 'relate back' to previously submitted documents that were, in themselves, insufficient to toll the statute." <u>Sibley v. Culliver</u>, 377 F.3d 1196, 1204 (11th Cir. 2004). Because Melson's unverified petition filed on 4 March 2002 was insufficient to toll the statute of limitations, his amended petition filed on 25 March 2002 does not relate back to the earlier filing date to toll the statute either. The

9

district court correctly determined that Melson's one-year limitations period was not statutorily tolled by either his unverified or verified Rule 32 petitions, rendering his federal habeas petition untimely under § 2244(d)(1)(A).

Even if we were to find that Melson's 4 March 2002 petition tolled the statute of limitations (which we do not), Melson's federal habeas petition would still be untimely under § 2244(d)(1)(A) because his notice of appeal was untimely. As discussed, the statute of limitations is tolled during the time a properly filed state habeas petition is pending. See 28 U.S.C. § 2244(d)(2). "The time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, *provided that* the filing of the notice of appeal is timely under state law." Evans v. Chavis, 546 U.S. 189, 191, 126 S. Ct. 846, 849 (2006) (emphasis in original). "If the filing of the appeal is timely, the period between the adverse lower court decision and the filing [of the appeal] is not counted against the 1-year AEDPA time limit." Id. at 192, 126 S. Ct. at 849.

The Alabama Court of Criminal Appeals dismissed Melson's appeal on 16 December 2002 because it was not timely filed. See Melson, 902 So. 2d at 717. Accordingly, Melson's application for state post-conviction review was not pending during the time between 17 October 2002, the date the circuit court

10

dismissed Melson's Rule 32 petition, and 6 December 2002, the date Melson filed a notice of appeal in the proper circuit court. See Evans, 546 U.S. at 191, 126 S. Ct. at 849. Even assuming the limitations period was tolled on 4 March 2002 (when Melson filed his unverified state habeas petition), the clock began running again on 17 October 2002. Because 363 days had elapsed by 4 March 2002, Melson had only two days left in which to file a timely federal habeas petition. Melson did not file his federal petition until 13 December 2004, well over two years later. Accordingly, because Melson exceeded the one-year statute of limitations under § 2244(d)(1)(A), his petition is untimely.

B.  Timeliness Under 28 U.S.C. § 2244(d)(1)(D)

Melson next argues that his federal habeas petition is timely under a second trigger date for the one-year statute of limitations. Under § 2244(d)(1)(D), the limitations period may begin running from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). Melson does not give a precise date as to when he could have learned of the factual predicates for his claims of newly discovered evidence. He suggests only a general time frame, the autumn of 2004, as the date when he discovered new evidence of his innocence and evidence which the prosecution allegedly suppressed in violation of Brady v. Maryland, 373 U.S.

83, 83 S. Ct. 1194 (1963). Because he filed his federal habeas petition in December 2004, Melson claims that he filed this petition within the one-year statute of limitations pursuant to § 2244(d)(1)(D).

The limitations period under § 2244(d)(1)(D) begins when the factual predicate of a claim could have been discovered using due diligence, not when it was actually discovered. See § 2244(d)(1)(D); Schleuter v. Varner, 384 F.3d 69, 74 (3d Cir. 2004). Although we have not defined due diligence with respect to a § 2244(d)(1)(D) claim, we have addressed it in the analogous context of a second federal habeas petition which is based on newly discovered facts. See In re Boshears, 110 F.3d 1538, 1540 (11th Cir. 1997) (per curiam). In the latter context, a petitioner must show that "'the factual predicate for the claim could not have been discovered previously through the exercise of due diligence.'" Id. (quoting 28 U.S.C. § 2244(b)(2)(B)(I)). Due diligence means the petitioner "must show some good reason why he or she was unable to discover the facts" at an earlier date. Id. Merely alleging that an applicant "did not actually know the facts underlying his or her claim does not pass the test." Id. Instead, the inquiry focuses on "whether a reasonable investigation . . . would have uncovered the facts the applicant alleges are 'newly discovered.'" Id. (citation omitted).

The district court did not determine if Melson could have known of the

12

factual predicates for his claims earlier through due diligence because it did not decide whether his federal petition was timely under § 2244(d)(1)(D). Rather, the court concluded that even if the petition were timely or subject to equitable tolling, Melson's claims would still be procedurally defaulted because he failed to raise them in a state habeas proceeding. We need not reach this issue of procedural default, however, because we conclude that Melson's federal petition is time-barred under § 2244(d)(1)(D).

Several affidavits submitted by Melson detail events where he was allegedly present. For example, Melissa King states in her affidavit that she told a police investigator she talked with Melson for about five minutes outside Frankie's between 11:00 and 11:30 P.M. on the night of the murders. Melson asserts that the government failed to disclose this fact in violation of Brady, and that it invited King to testify falsely at trial that she did not see Melson at Frankie's, in violation of Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 766 (1972). King has since said her affidavit was inaccurate, however, and acknowledged that she testified truthfully at trial. Even if King's affidavit were true, Melson would have known before trial that he saw and spoke to King at Frankie's that night. He could have questioned King prior to trial about any statements she made to the police. Melson also could have cross-examined King at trial about her statements to the

13

police and whether they asked her to lie. Tellingly, Melson did not ask King any questions at trial.

Similarly, Joyce Watson ("Joyce") alleges in her affidavit that she told the police Melson was at her apartment the night of the murders when Julio St. George ("St. George") arrived with a bag of bloody clothes, ordered Joyce to burn them, and then switched shoes with Melson. Vanessa Watson, who was not present that night, states in her affidavit that Joyce told her a few months after the murders that St. George and Peraita picked up Melson at Joyce's apartment after the murders. Again, Melson would have had personal knowledge of these events if they occurred and could have questioned the Watsons before trial about any statements they made to the police.

The factual predicates for Melson's Brady claim concerning Bryant Archer's alleged statements to the police also could have been discovered before trial. According to Melson, the government did not disclose that Archer, the sole surviving witness, told the police that: (1) the black assailant had bushy hair and was slightly taller than Peraita, and (2) that the robbers entered Popeye's at 11:30 P.M. As with King's and Watson's alleged statements, Melson has not produced any police report showing that Archer made these statements. Even if he did, Melson's trial counsel acknowledged that he saw the photo line-up shown to

14

Archer, Melson's photograph taken the night of the robbery, and Archer's statement that the black male was wearing a hat. Melson could have asked Archer prior to trial what else he told the police, if anything, about the robbers and time of the crimes. "Criminal defendants are presumed to have conducted a reasonable investigation of all facts surrounding their prosecution." Boshears, 110 F.3d at 1540.

Melson further asserts that Laura Laverty failed to testify at trial about information known to the prosecution but not to defense counsel, including the fact that the prosecutor threatened her into testifying. Laverty has not submitted an affidavit stating she was threatened by the police. Instead, Melson proffers an affidavit from Edmundo Peraita ("Edmundo") who claims that Laverty said the police threatened her into disclosing that Edmundo told her he threw his brother's gun into the river, although Edmundo cannot remember the circumstances under which she was threatened. Melson concedes, however, that his trial counsel learned before trial that Edmundo had led the police to the gun. If Melson had questioned Edmundo before trial as to who he told about the disposal of the murder weapon, Melson could have discovered at that time any alleged threats to Laverty. Melson has thus not shown he exercised due diligence in discovering these claims.

Melson further asserts that the prosecution did not disclose a statement

15

signed by Edmundo after he was questioned by the police. There is no evidence that any such signed statement exists. Edmundo states in his affidavit that after he showed police officers where he put the gun, the "police had me sign something but I do not recall what it was." R1-19, Attachment 10 at 3. As noted, Melson knew before trial that Edmundo led officers to the gun and thus could have discovered at that time whether Edmundo had signed a written statement to this effect.

In sum, Melson has failed to show that the factual predicates of his claims could not have been discovered through due diligence until the autumn of 2004. To the contrary, Melson either had personal knowledge of, or could have discovered using due diligence, the factual predicates for his claims prior to his 1996 state court trial. Accordingly, because the one-year limitations period does not run from the autumn of 2004, Melson's petition is not timely under § 2244(d)(1)(D).

C. Equitable Tolling Based on Attorney Misconduct

Even if Melson's petition cannot be statutorily tolled, he argues that it should be equitably tolled based on the misconduct and abandonment of his state post-conviction attorneys. Specifically, Melson alleges that his post-conviction attorneys did not tell him that his initial Rule 32 petition was dismissed, his

attorneys missed deadlines, and they did not adequately communicate with him about the status of his case. Melson also faults his attorneys for their failure to file a timely notice of appeal from his Rule 32 petition filed on 25 March 2002 and complains that one of his post-conviction attorneys only met with him once.

The Supreme Court has yet to decide whether the AEDPA's statute of limitations permits equitable tolling but has assumed that it does where the parties agree it is available. See Lawrence v. Florida, 549 U.S. 327, ___, 127 S. Ct. 1079, 1085 (2007). In order for equitable tolling to apply, a petitioner has the burden of proving: "(1) that he ha[d] been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at ___, 127 S. Ct. at 1085 (quotation marks and citation omitted). We have emphasized that "[e]quitable tolling is an extraordinary remedy that must be applied sparingly" for "[a] truly extreme case." Holland v. Florida, 539 F.3d 1334, 1338 (11th Cir. 2008) (per curiam). Attorney negligence, even gross negligence, does not warrant equitable tolling. Id. at 1339; see also Lawrence, 549 U.S. at ___, 127 S. Ct. at 1085 (attorney error does not "warrant equitable tolling, particularly in the post-conviction context where prisoners have no constitutional right to counsel"). There must be "an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part" in order for a court to

17

find there was such egregious attorney misconduct that a petitioner is entitled to equitable tolling. Holland, 539 F.3d at 1339.

None of Melson's assertions of attorney misconduct, even if true, rise to the level of egregious attorney misconduct warranting equitable tolling. Melson does not allege that his post-conviction attorneys acted in bad faith, were dishonest, had a divided loyalty, or were mentally impaired. The fact that his attorneys missed deadlines is insufficient to equitably toll the limitations period. See Lawrence, 549 U.S. at ___, 127 S. Ct. at 1085 (attorney miscalculation of the limitations period does not warrant equitable tolling because this "would essentially equitably toll the limitations periods for every person whose attorney missed a deadline"). Even when combined with his attorneys' alleged failure to communicate about the status of his case, no egregious misconduct has been shown. See Holland, 539 F.3d at 1339 (no equitable tolling where post-conviction attorney failed to file a federal habeas petition timely and inform petitioner of the status of his case despite repeated requests). Accordingly, the district court correctly concluded that any attorney error by Melson's post-conviction attorneys did not warrant equitable tolling of the AEDPA's statute of limitations.

D. Actual Innocence

Melson submits that, even if his petition is untimely, he should be allowed to

18

proceed on the merits of his claims because he is actually innocent of the crimes. He contends that he has made a threshold showing of innocence justifying a review of his underlying constitutional claims as required by Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851 (1995), and House v. Bell, 547 U.S. 518, 126 S. Ct. 2064 (2006). As a result, he argues that dismissal of his petition for untimeliness would violate his rights under the Eighth and Fourteenth Amendments[5] and the Suspension Clause of the United States Constitution. See Wyzkowski v. Dep't of Corr., 226 F.3d 1213, 1215 (11th Cir. 2000).

Neither the Supreme Court nor this Court has ever held that the Constitution requires an actual innocence exception to the AEDPA's one-year limitations period. See Johnson v. Florida Dep't of Corr., 513 F.3d 1328, 1333 (11th Cir. 2008) ("To date, this Court has avoided this constitutional issue because no time-barred petitioner has made the requisite actual-innocence showing."). Before reaching this question, the petitioner must first make a sufficient showing of actual innocence. Id. This requires the petitioner to produce "'new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

---

[5]Although Melson claims dismissal of his petition violates the Eighth and Fourteenth Amendments, he does not make a Herrera claim that he has shown freestanding innocence such that his imprisonment and planned execution are unconstitutional. See Herrera v. Collins, 506 U.S. 390, 417, 113 S. Ct. 853, 869 (1993) (assuming without deciding that a capital defendant's execution would be unconstitutional and warrant federal habeas relief if he made a "truly persuasive demonstration of 'actual innocence'").

19

critical physical evidence – that was not presented at trial.'" Arthur, 452 F.3d at 1245 (quoting Schlup, 513 U.S. at 324, 115 S. Ct. at 865). If the petitioner shows "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," then he has made a "gateway" claim of innocence allowing his otherwise barred constitutional claims to be considered on the merits. Schlup, 513 U.S. at 315, 327, 115 S. Ct. at 861, 867.

In evaluating this new evidence, a habeas court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." House, 547 U.S. at 537, 126 S. Ct. at 2077 (quotation marks and citation omitted). The court then assesses the likely impact of this new evidence on reasonable jurors. Id. at 538, 126 S. Ct. at 2077. The demanding nature of the Schlup standard ensures that only the "extraordinary" case will merit review of the procedurally barred claims. Id.

Melson proffers the following evidence of his innocence: (1) two statements made by his co-defendant Peraita in 2001 and 2002 that Melson was not his accomplice; (2) Melissa King's 2005 affidavit recanting her trial testimony that Melson asked her to provide a false alibi; (3) a 2005 affidavit by Sara Romano, a private investigator, recounting Bryant Archer's alleged statements that the robbers entered Popeye's at 11:30 P.M. and that the black male had bushy hair and was a

20

little taller than Peraita; (4) the 2005 affidavits of Joyce Watson and her sisters implicating Julio St. George, and not Melson, as Peraita's accomplice; and (5) Edmundo Peraita's 2005 affidavit stating that Laura Laverty talked to the police because they threatened her, and that he signed a statement after being questioned by police.

None of these proffered statements are sufficient to satisfy the threshold showing required by Schlup. In his 2001 and 2002 statements, Peraita says that he robbed Popeye's with someone other than Melson, dropped his unidentified accomplice off, then picked up Melson at Frankie's. Melson did not attach an affidavit by Peraita attesting to these statements but merely referenced them in the body of his amended habeas petition. In addition to the unreliable nature of these statements, the timing of their submission is circumspect given that these statements were made years before Melson presented them for the first time in this petition. Further, these statements conflict with Joyce and Vanessa Watson's affidavits that Melson was at Joyce's apartment when the murders occurred and that Peraita picked him up from Joyce's apartment after the murders. Peraita's statements do not constitute the type of trustworthy, reliable evidence that Schlup envisioned.

King's affidavit that she saw Melson at Frankie's between 11:00 and 11:30

21

P.M. the night of the murders is also unconvincing. First, it conflicts with her trial testimony that Melson asked her to provide a false alibi for him and also conflicts with Laura Laverty's trial testimony that Melson was at her residence from 11:00 to 11:30 P.M. that night. Second, King has since clarified her affidavit in an interview with a prosecutor from the Alabama Attorney General's Office, in which she explains that she only remembers exchanging hellos with someone who sounded like Melson as she walked past a group of people outside Frankie's. She is unsure whether this even occurred on the night of the Popeye's robbery. King further said that no state authority has ever told her to lie about Melson's presence at Frankie's that night and that she testified truthfully and fully at Melson's trial. In any event, given that the Alabama Court of Criminal Appeals found that the crime occurred at approximately 12:00 A.M., King's affidavit that she saw him between 11:00 and 11:30 P.M. does not exonerate Melson. See Melson, 775 So. 2d at 864.

Likewise, Archer's purported statement that the robbers entered Popeye's at 11:30 P.M. does not conflict with trial testimony concerning the timeframe of the robbery. Given that Archer did not give a physical description of the black assailant at trial, the details about the black assailant's hair and height do not conflict with his testimony nor establish Melson's innocence. Further, Archer's

22

statements are unreliable because Archer did not make them in an affidavit. Melson has instead submitted an affidavit by a defense investigator recounting her interview with Archer. The investigator notes, however, that Archer refused to talk with her again because defense counsel had "twisted" his words in the amended habeas petition. R1-19, Attachment 6 at 2.

Next, Melson claims that Julio St. George was Peraita's actual accomplice in the murders. Melson's evidence of this claim is Joyce Watson's affidavit and two affidavits by Watson's sisters, LaShunda Davis and Vanessa Watson. As discussed earlier, Joyce claims that Melson was at her apartment when St. George, carrying a bag of bloody clothing, arrived on the night of the murders with Peraita. However, LaShunda Davis, who also claims to have been at Joyce's apartment that night, omits any mention of Melson being present or of St. George carrying a bag of bloody clothes. These statements also conflict with Melson's other purported alibi presented at trial that he was in the Green Pastures area at the time of the murder. Melson's decision to produce a second set of conflicting alibi witnesses "at the 11th hour with no reasonable explanation for the nearly decade-long delay" is suspect. Arthur, 452 F.3d at 1246 (quotation marks and citation omitted).

Finally, Melson has not shown how the affidavit of Edmundo Peraita demonstrates he is actually innocent of the crimes. In that affidavit, Edmundo

23

claims that Laura Laverty was threatened into telling police that he found and disposed of the murder weapon, and that Edmundo signed a statement after being questioned by the police. These allegations, even if true, do not pertain to whether Melson committed the crimes.

Melson's evidence falls far short of the threshold required for a gateway claim of innocence. The petitioner in House met the threshold based on substantial evidence pointing to a different suspect, coupled with new, reliable DNA and forensic evidence undermining the central proof of semen and blood. See House, 547 U.S. at 554, 126 S. Ct. at 2086. Even then, the Supreme Court noted the "issue is close" as to whether the petitioner met the Schlup standard of proof. Id. In contrast, Melson has only produced conflicting statements, several of which are unverified or discredited by the affiant, that purport to establish two different alibis. This is not the "rare case where – had the jury heard all the conflicting testimony – it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." Id. Moreover, because Melson failed to make a threshold showing of actual innocence, the district court properly denied his motions for discovery and an evidentiary hearing. See Sibley, 377 F.3d at 1206. Melson is thus not entitled to a review of the merits of his time-barred claims.

24

## III. CONCLUSION

Melson's federal habeas petition is untimely under both § 2244(d)(1)(A) and § 2244(d)(1)(D). Neither triggering date was statutorily tolled by his Rule 32 proceedings pursuant to § 2244(d)(2). Melson has also failed to show that the AEDPA's one-year statute of limitations should be equitably tolled based on the conduct of his state post-conviction attorneys or his claims of actual innocence. As there are no legal grounds excusing the untimeliness of his federal habeas petition, the district court correctly dismissed the petition and denied relief.

AFFIRMED.