Joel ALCOX, aka Joel Albert Alcox, Petitioner,

v.

James HARTLEY, Warden, Avenal State Prison, Respondent.

No. CV 08–1587–JVS(RC).

United States District Court, C.D. California.

April 23, 2009.

Juliana Drous, Law Offices of Juliana Drous, San Francisco, CA, for Petitioner.

Jason C. Tran, Office of the Attorney General of California, Los Angeles, CA, for Respondent.

## JUDGMENT

JAMES V. SELNA, District Judge.

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the petition for writ of habeas corpus and the action are dismissed as untimely.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered dismissing the petition and the action as untimely.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable James V. Selna, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On May 8, 1987, in Santa Barbara Superior Court case no. SM50213, a jury con-

victed petitioner Joel Alcox, aka Joel Albert Alcox, of one count of first degree murder in violation of California Penal Code ("P.C") § 187 (count 1), one count of robbery in violation of P.C. § 211 (count 2), and one count of first degree burglary in violation of P.C. § 459 (count 3), and the jury found it to be true that petitioner was armed as a principal with a firearm during the commission of the crimes within the meaning of P.C. § 12022(a).[1] Clerk's Transcript ("CT") 729–35. The petitioner was sentenced to the total term of 26 years to life in state prison. CT 1020–22.

Petitioner appealed his convictions and sentence to the California Court of Appeal, CT 1023, which in an unpublished opinion filed October 6, 1988, modified the judgment to stay the sentences on counts 2 and 3, and affirmed the judgment as modified. Lodgment nos. 4–7. The petitioner, proceeding through counsel, filed a petition for review in the California Supreme Court, which denied the petition on December 21, 1988. Lodgment nos. 8–9.

On February 28, 2002, petitioner, proceeding through counsel, filed a petition for habeas corpus relief in the Santa Barbara County Superior Court, Lodgment nos. 10–14, which issued an order to show cause to the State of California, and, after briefing by the parties, denied the petition "without prejudice to its renewal should admissible evidence of actual innocence warranting an evidentiary hearing become available." Lodgment no. 15.[2]

On October 9, 2003, petitioner, still proceeding through counsel, filed his second petition for writ of habeas corpus in the Santa Barbara County Superior Court, and that petition included a declaration from Richard Lothery. Habeas Corpus Clerk's Transcript ("HCCT") at 1–478. The Superior Court again issued an order to show cause, and, after briefing by the parties, appointed counsel to represent petitioner and scheduled an evidentiary hearing. HCCT 479–82, 486–743. On June 22, 2005, following the evidentiary hearing, the Superior Court granted the petition for habeas corpus relief, finding petitioner was

---

1. Petitioner was originally charged with co-defendant Richard Lamont Lothery, CT 2–7, 550–55; however, the trial court granted Lothery's motion to sever, CT 577, and Lothery was convicted of first degree murder, robbery and burglary. *In re Alcox*, 137 Cal. App.4th 657, 663, 40 Cal.Rptr.3d 491 (2006); Evidentiary Hearing Reporter's Transcript ("EHRT") 109:24–28.

2. In denying the petition without prejudice, the Superior Court discussed petitioner's claim of "actual innocence," finding:

Here the issue of whether petitioner's confession of involvement in the robbery and murder of Thakorbhai Patel on February 16, 1986 was in some manner coerced has been fully and fairly litigated. The claims that the victim identified "Sanjay" as the shooter, that Sanjay Patel made a 911 call confessing, and that he gave a gun to Junia Fritz after the shooting, were heard and considered by the jury.... [¶] Here the most significant new evidence consists of reports of statements by convicted co-defendant Richard Lothery suggesting that the crime was committed by himself and Sanjay Patel. The reports, however, are unsworn. Even if the statement could be regarded as declarations against penal interest-not at all an obvious proposition in the circumstances-such out of court statements do not carry significant weight to establish a preponderance of credible evidence in petitioner's favor. Counsel has indicated that Richard Lothery is unwilling to make a sworn statement. The court therefore concludes that the threshold showing to justify an evidentiary hearing has not been made. [¶] The additional claim of ineffective assistance of counsel founders on much the same basis. Absent more convincing evidence of actual innocence, there is no reason to believe that the tactical choices made by trial counsel had prejudicial effect on the final outcome. Lodgment no. 15 at 1:25–2:22.

denied his Sixth Amendment right to effective assistance of counsel; however, the Superior Court did not make a finding of factual innocence. HCCT 1147–59; CT 1148, 1151–55.

The State of California appealed the judgment to the California Court of Appeal, Lodgment nos. 16–20, which reversed the judgment in a published opinion filed March 10, 2006, and modified the opinion on denial of rehearing on March 28, 2006. Lodgment nos. 21–23; *In re Alcox*, 137 Cal.App.4th 657, 40 Cal.Rptr.3d 491 (2006). On April 18, 2006, petitioner filed a petition for review in the California Supreme Court, which denied review on June 28, 2006. Lodgment nos. 24–25.

On July 27, 2006, petitioner, still proceeding through counsel, filed his third petition for habeas corpus relief in the Santa Barbara County Superior Court, which denied the petition on November 20, 2006, finding the petition to be a "successive" petition and also finding "the purported new evidence [does not] give rise to a constitutionally grounded exception [to filing a successive petition] . . . especially . . . in light of both the Superior Court and Appellate Court findings of fact and conclusions of law in the prior writ." Lodgment nos. 26–27. On December 5, 2006, petitioner filed a habeas corpus petition in the California Supreme Court, which, after requesting an informal response from the State of California, denied the petition on January 3, 2008. Lodgment nos. 28–32.

## II

On March 7, 2008, petitioner, proceeding through counsel, filed the pending habeas corpus petition under 28 U.S.C. § 2254, and on July 10, 2008, respondent filed a motion to dismiss the petition, arguing it is untimely. On September 8, 2008, petitioner filed his opposition to the motion to dismiss.

In the pending habeas corpus petition, petitioner raises the sole claim that he "was denied his Sixth Amendment right to effective assistance of counsel at his 1987 trial." [3]

## DISCUSSION

### III

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "established a one-year period of limitations for federal habeas petitions filed by state prisoners," *Bryant v. Arizona Attorney Gen.*, 499 F.3d 1056, 1059 (9th Cir.2007), as follows:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

\* \* \*

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction

---

**3.** Although petitioner raises only the claim of ineffective assistance of counsel, the petition, nevertheless, attacks petitioner's confession as being based on coercive and suggestive interrogation tactics. *See,* e.g., Petition ¶¶ 110–12. However, the Court will not consider the vol- untariness of petitioner's confession, since that issue was fully and fairly litigated at petitioner's trial and on direct appeal, *see* Lodgment nos. 4–9, and, for the reasons set forth herein, any attempt to now raise the issue on federal habeas review is untimely.

or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection. 15

28 U.S.C. § 2244(d).

The petitioner's conviction became final long before the passage of AEDPA, which was effective April 24, 1996. However, AEDPA's one-year statute of limitations did not begin to run prior to AEDPA's enactment. *Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999); *see also Lindh v. Murphy*, 521 U.S. 320, 322–23, 336–37, 117 S.Ct. 2059, 2061, 2068, 138 L.Ed.2d 481 (1997) (applying AEDPA only to cases filed after its effective date). Thus, a state prisoner such as petitioner, whose conviction became final before AEDPA's effective date, had one year and one day from AEDPA's enactment, or until April 24, 1997, to file a federal habeas corpus petition. *Bryant*, 499 F.3d at 1059; *Roy v. Lampert*, 465 F.3d 964, 969 (9th Cir.2006), *cert. denied sub nom., Belleque v. Kephart*, 549 U.S. 1317, 127 S.Ct. 1880, 167 L.Ed.2d 386 (2007).

■ The instant action was not filed until March 7, 2008—almost **eleven years** after the statute of limitations ran. However, this Court must consider whether the statute of limitations was statutorily tolled or equitably tolled. Initially, the filing of petitioner's state habeas petitions did not statutorily toll the limitations period since all of the state habeas corpus petitions were filed after the statute of limitations had expired; thus, they neither tolled nor revived the expired limitations period. *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir.2001), *cert. denied*, 538 U.S. 949, 123 S.Ct. 1627, 155 L.Ed.2d 492 (2003); *Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000).

■ Nor does Section 2244(d)(1)(D), which provides the statute of limitations commences later than under Section 2244(d)(1)(A) if petitioner did not know, or through the exercise of due diligence could not discover, the factual predicate of his claims assist petitioner. *Redd v. McGrath*, 343 F.3d 1077, 1084 (9th Cir.2003); *Hasan v. Galaza*, 254 F.3d 1150, 1154 n. 3 (9th Cir.2001); *see also Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir.2004) ("Section 2244(d)(1)(D) provides a petitioner with a later accrual date than Section 2244(d)(1)(A) only 'if vital facts could not have been known.'" (quoting *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir.2000))), *cert. denied*, 544 U.S. 1037, 125 S.Ct. 2261, 161 L.Ed.2d 1067 (2005). "[T]he date of the 'factual predicate' for [petitioner's] claim under § 2244(d)(1)(D) ... is determined ... by inquiring when [petitioner] could have learned of the factual basis for his claim through the exercise of due diligence[,]" *Redd*, 343 F.3d at 1084; *Schlueter*, 384 F.3d at 74, not when petitioner learns the legal significance of those facts. *Hasan*, 254 F.3d at 1154 n. 3; *Owens*, 235 F.3d at 359. "Due diligence ... require[s] reasonable diligence in the circumstances." *Schlueter*, 384 F.3d at 74. Moreover, "[t]he test of due diligence under section 2244(d)(1)(D) is objective, not subjective." *Wood v. Spencer*, 487 F.3d 1, 5 (1st Cir. 2007), *cert. denied*, —— U.S. ——, 128 S.Ct. 260, 169 L.Ed.2d 191 (2007). "[T]he petitioner bears the burden of proving that he exercised due diligence, in order for the statute of limitations to begin running from the date he discovered the factual predicate of his claim, pursuant to 28 U.S.C. § 2244(d)(1)(D)." *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir.2006). This petitioner cannot do.

■ "[T]o have the factual predicate for a habeas petition based on ineffective assistance of counsel, a petitioner must

have discovered (or with the exercise of due diligence could have discovered) facts suggesting both unreasonable performance *and* resulting prejudice." *Hasan,* 254 F.3d at 1154 (emphasis in original). Here, petitioner is vague about the date he claims he discovered his defense counsel's ineffectiveness. In the memorandum supporting his habeas petition, petitioner claims he discovered his defense counsel's ineffectiveness on **September 27, 2003,** when Lothery delivered a signed declaration to petitioner's habeas counsel, and, thus, the limitations period commences to run under Section 2244(d)(1)(D) on that date. Memorandum of Points and Authorities ("Memo.") at 3:2–4:9. Yet, petitioner also claims the statute of limitations did not begin to run under Section 2244(d)(1)(D) until **June 29, 2006,** which is "the first date following [petitioner's] discovery of the predicate facts [regarding alibi witnesses] on which [petitioner's] conviction was reinstated." Oppo. at 2:27–9:26. In either event, petitioner has not, and cannot, meet his burden of demonstrating he exercised due diligence in discovering the factual predicate of his ineffective assistance of counsel claim. To the contrary, petitioner took no meaningful action regarding his claim for more than ten years: from December 21, 1988, when the California Supreme Court denied his petition for review, until March 1999, when a distant relative began to search for an attorney to represent petitioner. *See* Petition at 119–20. Here, petitioner offers absolutely no reason why he did not attempt to obtain the "new" declarations from Lothery and others much earlier than he did. Clearly, he was well aware of the declarants' identities even prior to his trial. *Schlueter,* 384 F.3d at 74–75; *Johnson v. McBride,* 381 F.3d 587, 589 (7th Cir.2004), *cert. denied,* 544 U.S. 926, 125 S.Ct. 1649, 161 L.Ed.2d 487 (2005); *see also United States ex rel. Caffey v. Briley,* 266 F.Supp.2d 789, 792–

93 (N.D.Ill.2003) (inmate who claimed he was actually innocent of his convictions did not exercise due diligence in discovering facts underlying his claim when approximately eight years after the crimes were committed inmate submitted an affidavit from one of the shooting victims, who stated inmate did not shoot him or anyone else, since victim, who was named in the indictment and interviewed in the hospital, was obviously known to petitioner long before the affidavit was submitted). In short, petitioner's "inaction is incompatible with a finding of due diligence. Hence, [petitioner] cannot avail himself of the exception limned in section 2244(d)(1)(D)." *Wood,* 487 F.3d at 5; *Schlueter,* 384 F.3d at 74–75; *cf. Woratzeck v. Stewart,* 118 F.3d 648, 652 (9th Cir.1997) ("[Petitioner] has had more than fifteen years to uncover this claim, and has not shown how 'due diligence' could not have uncovered this evidence.").

▮ Finally, the Court finds petitioner is not entitled to equitable tolling of AEDPA's statute of limitations. A habeas petitioner is entitled to equitable tolling "only if extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Miles,* 187 F.3d at 1107 (citation and internal quotation marks omitted); *Espinoza–Matthews v. People of the State of Cal.,* 432 F.3d 1021, 1026 (9th Cir.2005). Moreover, petitioner bears the burden of proving: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 419, 125 S.Ct. 1807, 1814, 1815, 161 L.Ed.2d 669 (2005); *Bryant,* 499 F.3d at 1061. Additionally, "the prisoner must show that the 'extraordinary circumstances' were the but-for and proximate causes of his untimeliness." *Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir.2003) (citations and inter-

nal quotation marks omitted); *Roy*, 465 F.3d at 969.

■■■■■ The petitioner claims he is actually innocent of the crimes for which he was convicted, and an actual innocence claim may constitute an "extraordinary circumstance" warranting equitable tolling under AEDPA, *see*, e.g., *Souter v. Jones*, 395 F.3d 577, 599 (6th Cir.2005) ("[E]quitable tolling of the one-year limitations period based on a credible showing of actual innocence is appropriate."); *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir.2000) ("Equitable tolling would be appropriate ... when a prisoner is actually innocent ...."), or act as an exception to the statute of limitations. *See*, e.g., *United States v. Zuno–Arce*, 339 F.3d 886, 890 n. 5 (9th Cir.2003) (petitioner's actual innocence claim "is not in itself a constitutional claim, but would serve only to remove the timeliness bar so that claims may be heard on the merits"), *cert. denied*, 540 U.S. 1208, 124 S.Ct. 1483, 158 L.Ed.2d 132 (2004); *O'Neal v. Lampert*, 199 F.Supp.2d 1064, 1066–67 (D.Or.2002). In either event, "[t]o be credible, [an actual innocence] claim requires petitioner to support his allegations ... with new reliable evidence ... that was not presented at trial[,]" and "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 324, 327, 115 S.Ct. 851, 865, 867, 130 L.Ed.2d 808 (1995); *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998); *see also Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir.2003) ("[H]abeas petitioners may pass *Schlup*'s test by offering 'newly presented' evidence of actual innocence."), *cert. denied*, 541 U.S. 998, 124 S.Ct. 2039, 158 L.Ed.2d 510 (2004); *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir.2002) (To pass through the *Schlup* gateway, "[a] petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that 'a court cannot have confidence in the outcome of the trial.'" (citation and internal quotation marks omitted)).

■■■■ Here, petitioner's lack of diligence is fatal to his actual innocence claim. *See*, e.g., *Pace*, 544 U.S. at 419, 125 S.Ct. at 1815 ("Under long-established principles, petitioner's lack of diligence precludes equity's operation."); *Welch v. Carey*, 350 F.3d 1079, 1083 (9th Cir.2003) (en banc) ("Tolling accommodates effort, not inaction."), *cert. denied*, 541 U.S. 1078, 124 S.Ct. 2423, 158 L.Ed.2d 991 (2004); *Gildon v. Bowen*, 384 F.3d 883, 887 (7th Cir.2004) ("'For [an actual innocence] claim to be viable, ... a petitioner would have to show some action or inaction on the part of the respondent that prevented him from discovering the relevant facts in a timely fashion, or, at the very least, that a reasonably diligent petitioner could not have discovered these facts in time to file a petition within the period of limitations.'") (quoting *Flanders v. Graves*, 299 F.3d 974, 978 (8th Cir.2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1361, 155 L.Ed.2d 203 (2003)), *cert. denied*, 543 U.S. 1168, 125 S.Ct. 1348, 161 L.Ed.2d 144 (2005); *Baker v. Norris*, 321 F.3d 769, 772 (8th Cir.) (petitioner claiming actual innocence not entitled to equitable tolling when she waited fifteen years to pursue claim), *cert. denied*, 539 U.S. 918, 123 S.Ct. 2283, 156 L.Ed.2d 135 (2003); *Whitley v. Senkowski*, 567 F.Supp.2d 490, 496 (S.D.N.Y.2008) ("[R]easonable diligence in pursuing an actual innocence claim is a prerequisite to equitable tolling of the AEDPA statute of limitations."); *Brown v. McKee*, 232 F.Supp.2d 761, 769 (E.D.Mich.2002) ("In the present case, petitioner has offered this Court no reasons why it took him over ten years after being convicted and sentenced on this crime to obtain the affidavits from [witnesses]....

Because petitioner has not pursued his claims with due diligence, he is not entitled to equitable tolling of the one year limitations period pursuant to an actual innocence exception.").

■ Further, the Court concludes petitioner has not met the actual innocence standard.[4] To address petitioner's actual innocence claim, it is helpful to understand the evidence presented at petitioner's 1987 trial. The California Court of Appeal summarized that evidence in affirming petitioner's conviction in 1988, and again in reviewing the Superior Court's grant of habeas corpus relief in 2006: [5]

*The Prosecution's Case*

Thakorbhai Patel, owner of the Lompoc Motel, was shot February 16, 1986, at approximately 6 p.m. One of the motel guests heard knocking at his door, found Patel outside, and called the police. Patel's living quarters were connected to the motel office. The lift-up portion of the counter in the office was up and the cash drawer open. A $5 dollar bill was found on the floor of the living room three or four feet from the door leading to the motel office. Blood spatters indicated Patel was shot in his living room[.] **[Patel had a bullet lodged in his jaw and had lost a lot of blood from a gunshot wound to the chest]**; he died shortly after arrival at the hospital. [¶] Two weeks later in the presence of 15–year–old Caroline Gonzales, [petitioner] stated that he and Ricky Lothery were present during the crime. He said that his fingerprints had been found there,

but that he would never be apprehended. A confidential informant told the police that Ricky Lothery and John Wilcox had committed the crime. Because [petitioner] was seen with a friend of Lothery and because of the similarity of his name to John Wilcox, [petitioner] was asked to come to the police station for an interview. [¶] After [petitioner] voluntarily went to the station for questioning, he ultimately confessed that he and Lothery needed money to buy more liquor as they had been drinking heavily the afternoon of the crime. Lothery pulled a revolver from his waistband and said, "Let's go get some money." As they walked past the Lompoc Motel, they noticed the office was empty. [Petitioner] muffled the door bell with his hand as they entered, went behind the counter and opened the cash drawer. Patel came into the office and yelled, "What are you guys doing?" [Petitioner] ran out, bumping Patel as he did so. When he was in the parking lot he heard two shots in quick succession. [¶] Carol Seilhamer, Lompoc police dispatcher, testified that March 26, 1986, she overheard a conversation between [petitioner] and Rick Lothery through vents in the jail. She took notes of the conversation in which Lothery complained that [petitioner's] confession "really fucked [them] up." [Petitioner] insisted that the only evidence against Lothery was [petitioner's] confession which [petitioner] would disavow. [Petitioner] planned to provide an alibi defense for himself.

---

**4.** " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623–24, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998); *Johnson v. Florida Dep't of Corrs.*, 513 F.3d 1328, 1334 (11th Cir.), *cert. denied*, —— U.S. ——, 129 S.Ct. 348, 172 L.Ed.2d 86 (2008); *Laurson v. Leyba*, 507 F.3d 1230, 1233 (10th Cir.2007).

**5.** The California Court of Appeal's 1988 factual summary is set forth in regular typeface and the California Court of Appeal's additional 2006 findings are set forth in brackets in bold.

Disconsolate, Lothery lamented, "We're looking at 25 years to life, and I don't think we're going to get out of this." **[[Petitioner] said that he would tell his lawyer "that I made a false statement" and said that his friends could provide an alibi defense. . . . [Petitioner] said that he could get friends to falsely testify. [Petitioner] told Lothery: "I got these mother fuckers who will swear I was w/them the whole w[ee]kend. I'll swear I made a false statement."]**

*The Defense*

Despite his confession, [petitioner] attempted to raise doubts whether Ricky Lothery actually shot Patel. **[At trial, [petitioner] claimed that a third person, Sanjay Patel, may have shot the victim.]** Sanjay Patel (no relation to the victim) is the son of the victim's friend and business partner, Prabhu Patel. [On] April 11, 1987, a call was placed to 911 in Lompoc in which the caller identified himself as Jay Patel and said, "I'm ready to go in for the murder. . . . I'm ready to confess to murder, Lompoc Motel." When the police asked for clarification he said, "I'm ready to admit to the murder." He then gave his name as Juniy Patel. This call was recorded and traced to Sanjay's parents' house. When an officer went to investigate, he found that Sanjay smelled of, and appeared to be under the influence of, alcohol. [¶] Junia Fritz testified that on the evening of the murder, Sanjay came to her apartment about 6:45 p.m., took a gun wrapped in a cloth from his waistband and asked her "to hold it for him" and to clean off the fingerprints. He retrieved it two days later. The motel guest who first found the victim reported that Mr. Patel said, "Sanjo, Sanjo, Sanjo." **[Paramedic Kathy Ginez heard Patel say "Sirgernol." Fireman Roy Belluz assisted the para-** **medic and heard Patel say "Haraj Mavar" before dying.]**

*Rebuttal*

Junia Fritz's mother made conflicting statements about the time Sanjay came to her apartment on February 16, 1986. Prior to trial, Junia Fritz repeatedly refused to talk to the police about the killing. When she finally spoke to the district attorney's investigator on one occasion, she said that Sanjay used to supply her with drugs but no longer did. Prabhu Patel said that his son was sometimes called "Jay" or "Sanjay," but never "Sanjo." [¶] Rico Tomaz, who resided at the county jail with Ricky Lothery, said Lothery told him that it "started out as a burglary, turned into a robbery, ended up a murder." [¶] Sean Hollich, another wayfarer in the jail, overheard Lothery say he was "in this place, and he pointed a gun at this guy and shot him." Lothery also bragged he was "an 18–year–old murderer." On another occasion, he heard Lothery say that "he shot the guy in the process of robbing this place when he was splitting."

Lodgment no. 7 at 2–6; *Alcox*, 137 Cal. App.4th at 660–62, 40 Cal.Rptr.3d 491.

 "Because *Schlup* explicitly states that the proffered evidence must be reliable, the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the preexisting evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir.2004), *cert. denied*, 546 U.S. 961, 126 S.Ct. 489, 163 L.Ed.2d 364 (2005). Here, Lothery's declaration is central to petitioner's actual innocence claim. In his declaration, Lothery states he was present when Patel was murdered, Sanjay shot Patel during a dispute, and petitioner "was *not* there or

invalved [sic]." [6] *See* Declaration of Richard Lothery ("Lothery Decl.") ¶¶ 3–12. Lothery subsequently testified at the evidentiary hearing in the Superior Court, essentially reiterating the details of his declaration,[7] but also stating he was unaware Sanjay had a gun when he and Sanjay went to the motel. EHRT 92:15–103:11. To the extent Lothery's declaration and evidentiary hearing testimony can be considered "new" evidence[8] they are clearly not reliable.[9] *See*, e.g., *Melson v. Allen*, 548 F.3d 993, 1002–03 (11th Cir. 2008) (co-defendant's statements that petitioner was not his accomplice "do not con-

stitute the type of trustworthy, reliable evidence that *Schlup* envisioned"); *Araujo v. Chandler*, 435 F.3d 678, 681–82 (7th Cir.2005) (rejecting actual innocence claim, in part, because trial judge found the testimony of petitioner's accomplice, who now claimed to be the shooter, to be incredible), *cert. denied*, 549 U.S. 810, 127 S.Ct. 39, 166 L.Ed.2d 18 (2006); *Allen*, 366 F.3d at 405–06 (Co-defendant's affidavit that exculpated petitioner without inculpating co-defendant "was inherently suspect because [co-defendant] could have signed the affidavit in order to help [petitioner] without

**6.** Lowery's declaration states, in pertinent part:

> The following declaration is my true account of what happened at the Lompoc Motel on the 16th[ ] day of February 1986, as to the death of the deceased, Thakorbhai Patel. [¶] I had been drinking with friends at the college park before noon. After leaving those friends in the early evening I met up with Sanjay Patel in part of Thrifty's, in the Lompoc shopping center. I had suggested to Sanjay that I was going to steal more alcohol from Thrifty's, but Sanjay had a power drill in his bag that he suggested we try to sell to his "uncle" Thakorbhai Patel at the motel. Sanjay and I went into the motel office and Thakorbhai [Patel] was behind the counter/cash register. Sanjay and Thakorbhai [Patel] started to argue in a language that I couldn't understand. I was standing inside the office, on the customer side of the counter,[ ] against the "enter" door. After a few[ ] minutes of arguing Sanjay took the drill from the bag and set it on the counter[.] Thakorbhai [Patel] opened up the cash register, took out a bill and threw it at Sanjay. This was later identified as a $5.00 bill found on the floor. Sanjay then took a gun from his back waist area and pointed it at Thakorbhai [Patel]. Thakorbhai [Patel] started yelling, in an angry way, and started to come through the lift-up counter. Sanjay fired one shot at Thakorbhai [Patel]. I turned and fled through the front door.

Lothery Decl. ¶¶ 3–4.

**7.** At the evidentiary hearing, Lothery stated Sanjay pulled the gun before Patel threw the

money at him. EHRT 99:25–100:5. However, on cross-examination, Lothery admitted he was "not exactly sure of the sequence of how things went[,]" he was "sticking to" his earlier testimony, and his declaration could be "rearrange[d] ... [to] fit [ ] to this testimony." EHRT 153:8–26, 156:6–157:3.

**8.** At petitioner's trial, the State called Lothery to testify as a rebuttal witness against petitioner, but Lothery asserted his Fifth Amendment privilege against self-incrimination. Reporter's Transcript ("RT") 323:10–324:1. Nevertheless, as the Superior Court found, evidence suggesting Sanjay killed Patel was raised at trial and is not new. *See* HCCT 1152 ("Sanjay Patel is not a new player in this cast of characters. He was previously pointed to as having been involved in the shooting. The original trial had portions devoted to the question of whether Sanjo was a nickname for Sanjay."); *accord Alcox*, 137 Cal.App.4th at 664, 40 Cal.Rptr.3d 491. Indeed, petitioner presented evidence, including the 911 call from "Jay Patel," suggesting Sanjay was the killer. However, any evidence presented to the jury cannot be the basis of petitioner's actual innocence claim. *Allen v. Yukins*, 366 F.3d 396, 405 (6th Cir.), *cert. denied*, 543 U.S. 865, 125 S.Ct. 200, 160 L.Ed.2d 109 (2004).

**9.** Nor are Lothery's statements made any more reliable because Carolyn Deroin (Lothery's former girlfriend) or James Voysey (Lothery's trial counsel) testified at the evidentiary hearing that Lothery told them Sanjay was the shooter. EHRT 203:2–209:14, 210:18–222:1.

endangering his own interests.") Here, Lothery's declaration serves not only to exonerate petitioner, but also to present Lothery himself as an innocent bystander who, unaware Sanjay was armed, merely accompanied petitioner to the motel to sell a drill to Patel, and then was present when Sanjay unexpectedly pulled out a gun and shot Patel.

 Similarly, Lothery's testimony at the evidentiary hearing is not reliable. In fact, the Superior Court, which observed Lothery's demeanor at the evidentiary hearing, specifically found "Mr. Lothery is not a credible witness. While testimony confirms that he previously gave his attorney a version similar to the trial testimony, Mr. Lothery has also given other versions. His demeanor while testifying and selective memory concerning the events makes his testimony suspect." HCCT 1151. This Court must defer to the Superior Court's credibility findings. *See Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983) (Section 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Sophanthavong v. Palmateer*, 378 F.3d 859, 867 (9th Cir.2004) ("Here, because the state court conducted an evidentiary hearing in which [petitioner] testified, we are required to defer to the state court's credibility findings." (citations omitted)). Even apart from such deference, this Court would find Lothery's declaration and evi-

dentiary hearing testimony inherently unreliable since, among other reasons, Lothery admitted he had repeatedly lied to the police and changed his story and was unable to remember various important details regarding the murder and subsequent events. *See* EHRT 109:22–160:18. For all these reasons, petitioner has not shown that even if Lothery had testified at trial as set forth in his declaration and at the evidentiary hearing, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327, 115 S.Ct. at 865, 867.

In addition to Lothery's declaration, petitioner has also presented the declarations of several purported "alibi" witnesses, whom he claims attest to petitioner being at a party at Kelly Hughes's house on the night of the shooting. *See* Declaration of Sean Daugherty ¶¶ 3–7; Declaration of Charles Robb ¶¶ 3–7; Declaration of Roberta Cornelison Ude (formerly Cornelison) ¶¶ 3–8; Declaration of Kathleen Webb Schmidt (formerly Webb) ¶¶ 3–6. Initially, the Court notes the information in these declarations is not really "new" since the police interviewed the declarants (and many others) as part of Patel's murder investigation. *See* Petition, Exhs. 42–51. Moreover, as the California Court of Appeal found, defense counsel and petitioner were well-aware of these witness' statements before trial, and in light of all the evidence, "made a reasonable tactical decision not to investigate [an] alibi [defense]."[10] *Alcox*, 137 Cal.App.4th at 665–67, 40 Cal.Rptr.3d 491. Nevertheless,

---

10. As the California Court of Appeal noted:
The record shows that [petitioner] was advised of [counsel's] decision not to advance an alibi defense. At the conclusion of the trial, the trial court noted that there was no alibi evidence and asked, "Was that done as a trial tactic?" [Counsel] stated that [petitioner] told him "he had some alibi witnesses who would place him somewhere

other than at the scene of the homicide, and I was also made aware that the District Attorney's office had witnesses who were at the same party who would testify that Alcox was not in fact present at that party. [¶] I was aware that he had made a statement to the police. I was also aware that his then attorney had attempted on various occasions to convince the court not to allow that

since the declarations are "newly presented" evidence, the Court will address them. *Griffin,* 350 F.3d at 963.

It is well recognized that "[e]xculpatory affidavits 'produced ... at the 11th hour with no reasonable explanation for the nearly decade-long delay' are 'suspect[,]'" *Arthur v. Allen,* 452 F.3d 1234, 1246 (11th Cir.2006) (quoting *Herrera v. Collins,* 506 U.S. 390, 423, 113 S.Ct. 853, 872, 122 L.Ed.2d 203 (1993) (O'Connor, J. concurring)), *modified by,* 459 F.3d 1310 (11th Cir.2006), *cert. denied,* 549 U.S. 1338, 127 S.Ct. 2033, 167 L.Ed.2d 763 (2007); *Melson,* 548 F.3d at 1003, and these declarations fall into that broad generalization. Moreover, these declarations do not help petitioner meet his burden under *Schlup* since only Robb's declaration definitively accounts for the period of time when Patel's murder occurred, at or around 6:43 p.m. on February 16, 1986. RT 31:21–32:7. The other declarations are extremely vague regarding petitioner's whereabouts at the time of the murder. For example, Daugherty's declaration merely states he arrived at the party "in the early

evening[,]" left the party for an unspecified period of time to pick up Webb "in town," and he "thinks" petitioner was there when he returned to the party.[11] Daugherty Decl. ¶5. Similarly, Webb's declaration states petitioner was not at the party when she arrived there in the late afternoon. Webb Decl. ¶5. Webb further states she stayed at the party for a little while, borrowed Daugherty's car to drive to Lompoc and pick up Cornelison, and when she returned "after it was dark[,]" petitioner was there.[12] *Id.* at ¶6. Similarly, Cornelison states that on the evening of the shooting, Webb picked her up at her house in Lompoc, they went and got something to eat, and they arrived at the party in the early evening, but petitioner was not there.[13] Cornelison Decl. ¶¶5–6. Cornelison further states she then went upstairs with Kelly Hughes and, when they came back down "a while" later, petitioner was there. *Id.* ¶7. These vague declarations do not exclude the possibility petitioner committed the murder. *Melson,* 548 F.3d at 1003; *Allen,* 366 F.3d at 405.

On the other hand, Charles Robb states:

statement to be admitted. I was confident that the statement would be admissible; that the jury would be much more likely to believe that statement than a statement from his witnesses or him ... that he wasn't there...." [¶] [Petitioner] agreed that was the defense strategy. [Counsel] stated: "Mr. Alcox and I made a tactical decision to approach this case rather than from a standpoint of alibi[,] that we would simply rely upon the statement [to the police] and attempt to convince the jury that he had disassociated himself from the offense of homicide prior to its occurrence. [¶] The Court: All right. Mr. Alcox, you understand what your attorney has said? [¶] The Defendant: Yes. [¶] The Court: You join? That was your decision along with his? [¶] The [Petitioner]: Yes." *Alcox,* 137 Cal.App 4th at 666, 40 Cal.Rptr.3d 491; RT 332:27–334:5.

11. In a police interview conducted March 28, 1986, Daugherty stated petitioner was **not** at

Hughes's apartment when he arrived at 7:00 p.m., and he did not see petitioner at the party until sometime after 8:30 p.m. Petition, Exh. 51.

12. In a police interview conducted on April 1, 1986, Webb stated she arrived at the party at around 5:30 or 6:30 p.m., and petitioner was not there. Petition, Exh. 46. Webb further stated she stayed at the party for a while, then left to pick up Cornelison, and returned to the party around 8:00 p.m., and petitioner was either at the party at this time or he arrived shortly thereafter. *Id.*

13. In a police interview conducted on March 28, 1986, Cornelison stated Webb picked her up at approximately 5:30 p.m., she arrived at the party no earlier than 6:30 p.m., she went upstairs with Hughes at about 7:30 p.m., and she saw petitioner when she went downstairs at about 9:00 p.m. Petition, Exh. 44.

Kelly Hughes and Joel Alcox showed up at my apartment on North B Street at about 4:00 p.m. They asked us if we wanted to go to a party at Hughes' house that night, and we (me and Craig Hamel) agreed. A short time later, Craig Hamel and I left in my car ..., and Kelly Hughes and Joel Alcox left in Hughes' car. [¶] All of us, in both cars, then drove to a couple of other houses in Lompoc to invite more people to the party. At each of these stops I waited in my car while Hughes and Alcox went inside. We then all drove to Hughes' house near Vandenburg [sic]. [¶] When we arrived at Hughes' house, **John** Alcox, Sean Daugherty and 3 or 4 other people were already there. I stayed at Hughes' house for a few hours, and Joel Alcox remained there the entire time.

Robb Decl. ¶¶ 4–7 (emphasis added). Under the circumstances presented herein,[14] and when considered in conjunction with all the other available evidence, Robb's declaration cannot meet the *Schlup* threshold. First, Robb's declaration is inconsistent with the declarations of Daugherty, Cornelius, and Webb. *See* Daugherty Decl. ¶ 5 (when he arrived at the party in the early evening, Hughes, David Paul and Birgitte Barker were there, but petitioner

was not); Cornelius Decl. ¶¶ 6–7 (when she arrived at the party, Hughes and Daugherty were there, but petitioner was not); Webb Decl. ¶¶ 5–6 (when she arrived at the party in the late afternoon, Daugherty, Hughes, Skip Santos and Chuck Garcia were there, but petitioner was not). Moreover, Robb's declaration is contradicted by police reports and investigative interviews prepared closer to the time of the murder, and before petitioner's trial, in which numerous other witnesses did not recall Robb being at the party on February 16, 1986.[15] *See* Petition, Exhs. 44–52.

Finally, the California Court of Appeal found that "[w]hile in jail, [petitioner] was overhead saying that he would concoct a false alibi defense." *Alcox,* 137 Cal. App.4th at 666, 40 Cal.Rptr.3d 491. Indeed, police dispatcher Carol Seilhamer overheard petitioner saying he "could get friends to falsely testify" and he has "these mother fuckers who will swear I was w/them the whole w[ee]kend." *Id.* at 661, 40 Cal.Rptr.3d 491; *see also* RT 141:28–143:11. In fact, when interviewed about Santos's statement that Santos was at home on the evening of February 16, 1986, petitioner admitted he was not at the party on the night of the murder.[16] HCCT 701.

---

**14.** In an earlier police interview conducted April 14, 1986, Robb stated he followed Hughes's vehicle to the party, arriving sometime before 8:00 p.m. Petition, Exh. 42.

**15.** In a defense interview conducted on April 30, 1986, Manuel Santos initially stated he did not recall Robb being at the party on the night of the murder, but later stated Robb and petitioner were at the party. Petition, Exh. 50. Moreover, previously, on March 28, 1986, Santos had informed the police he did not know whether petitioner was at the party on February 16, 1986. Petition, Exh. 49. Santos also told a defense investigator that a statement he had given to the police three days earlier, in which he said he was at home the entire evening of February 16, 1986, was false. *Id.* Clearly, Santos's statements to the

defense interviewer contradict those of numerous other witnesses, including Daugherty, Cornelison and Webb. *See* Petition, Exhs. 44, 46, 51.

**16.** In reviewing the evidentiary hearing transcript, the California Court of Appeal also noted that little changed in the years following petitioner's conviction, stating:

At the hearing on the habeas petition, [petitioner] was asked if he was at Kelly Hughes' house on February 16, 1986, when the shooting occurred. [Petitioner] answered, "I'm not sure. I don't know." He stated: "Every day I was partying. I was drinking, I was doing drugs. One day really blurred into the next, and so I couldn't really say where I was ...."

Similarly, the California Court of Appeal made the unrebutted factual finding that Robert Garcia, who testified on petitioner's behalf at the evidentiary hearing:

> talked to other people about the shooting, refuting [petitioner's] claim that he had an alibi. In an April 11, 1986 police report, District Attorney Investigator Kenneth Ast provided the following summary of a taped interview with Leslie Gibeau: "GARCIA told her (unknown time) that he (GARCIA) had spoke with Joel ALCOX and Ricky LOTHERY. GARCIA said that ALCOX and LOTHERY told him that they were walking through the Motel when they heard a shot."

*Alcox,* 137 Cal.App.4th at 670–71 n. 7, 40 Cal.Rptr.3d 491. For all these reasons, "[t]he new [declarations] are insufficient to satisfy the threshold showing under *Schlup ....*" *Arthur,* 452 F.3d at 1246.

▮ Petitioner next relies on the "new" evidence from Carolina Gonzales–Branson (formerly Gonzales), in which she states, among other things, that she "never felt comfortable with [her] testimony" at trial and believes "there is a great possibility that any testimony [she] gave [at trial] was inaccurate" due to "the combination of rumors and speculation, rife at the time of the incident[,] and [her] use of mind-altering drugs [LSD]." Petition, Exh. 39. Gonzales states she was on LSD the night she overheard petitioner, but she did not lie about what she remembered. Petition, Exh. 38. Rather, she testified to what she remembered, although she does not know

if "it [was] a figment of [her] imagination[.]" *Id.* Initially, Gonzales's "statement" is not admissible evidence since it is not provided under penalty of perjury and does not substantially comply with 28 U.S.C. § 1746. Moreover, the Superior Court specifically found "Ms. Gonzales did not repudiate her prior testimony as claimed. She did appear concerned that she was young at the time of her [trial] testimony and had been using drugs. She also said that she would not intentionally lie." HCCT 1151; *see also Alcox,* 137 Cal.App.4th at 670–71 n. 7, 40 Cal.Rptr.3d 491 ("The superior court found that Gonzales was a credible witness."). Thus, at best, Gonzales's statement could be used to attack the credibility of her statements at trial. Similarly, petitioner relies on the evidentiary hearing testimony of Robert Garcia, which the Superior Court found contradicted Gonzales's testimony.[17] HCCT 1151. This evidence is also of limited value, and could be used, at most, to attack Gonzales's credibility. When considered with all the other evidence presented, neither Gonzales's nor Garcia's statements satisfy the *Schlup* requirements. *Arthur,* 452 F.3d at 1246.

Finally, petitioner relies on the "new" evidence from: Kathy Kelly Ginez (formerly Kelly), the paramedic who treated Patel and who testified at the evidentiary hearing that Patel was asked who shot him, and he responded with a name that began with an "S" and that sounded like "Sanjo," but could have been "Sanjay" or "Surginol,"[18] EHRT at 436:25–469:12;

---

*Alcox,* 137 Cal.App.4th at 667, 40 Cal.Rptr.3d 491; *see also* EHRT 36:12–14.

**17.** As set forth above, Gonzales testified she was present during a conversation between petitioner and Garcia in which petitioner stated he and Lothery were at the murder scene and the police had their fingerprints but would never catch them. RT 106:13–112:28.

At the evidentiary hearing, however, Garcia testified that no such discussion occurred. RT 194:15–197:24.

**18.** Kelly testified at Lothery's trial that the name she heard Patel say sounded like "Sirgernol." EHRT 450:12–451:5; *see also* Petition, Exhs. 61–62.

Tracy Maniscalco, Kelly's daughter, who testified at the evidentiary hearing that she was present at the murder scene and heard Patel say "Sanjay," EHRT 387:13–402:2; and Lompoc Fire Captain Roy Belluz, who states in a declaration that he asked Patel what happened and who had hurt him, and Patel "kept saying a name that sounded like 'Singji' or 'Sergenal[,]'" but, in retrospect, may have sounded more like "Sanjay."[19] Declaration of Roy Belluz ¶¶ 2–9. However, as the Superior Court noted, at petitioner's trial, Sanjay was "pointed to as having been involved in the shooting. The original trial had portions devoted to the question of whether Sanjo was a nickname for Sanjay." HCCT 1152. Moreover, the jury that convicted petitioner heard the 911 call in which an individual telephoning from Sanjay's home, identified himself as "Jay Patel" and stated he was ready to confess to the murder. *Alcox*, 137 Cal.App.4th at 661–62, n. 2, 40 Cal. Rptr.3d 491. The additional evidence presented here does not meet the *Schlup* standard.

For the reasons set forth above, this Court cannot say that "it is more likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327, 115 S.Ct. at 865, 867; *Melson*, 548 F.3d 993, 1003–04. Therefore, petitioner has not established his factual innocence of Patel's murder, and grounds do not exist to equitably toll the statute of limitations. The habeas corpus petition is untimely, and must be dismissed on that ground.

### RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) entering Judgment dismissing the petition and action as untimely.

---

19. Captain Belluz testified at petitioner's preliminary hearing that he heard Patel say "Haraj Mavor." CT 157–59.