Jimmy Nathan MOODY, Petitioner,

v.

Debra DEXTER, Warden, California Dept. of Corrections, Ironwood State Prison, Respondent.

Case No. CV 08–4530–ODW (RC).

United States District Court, C.D. California.

Oct. 28, 2009.

Franklin Peters, Jr., Franklin Peters Law Offices, Los Angeles, CA, for Petitioner.

Kenneth C. Byrne, Xiomara Costello, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

OTIS D. WRIGHT II, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, as well as petitioner's objections, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judg-

ment shall be entered dismissing the petition and the action as untimely.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner.

## JUDGMENT

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the petition for writ of habeas corpus and the action are dismissed as untimely.

## REPORT AND RECOMMENDATION OF A UNITED STATES MAGISTRATE JUDGE

ROSALYN M. CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Otis D. Wright II, United States District Judge, by Magistrate Judge Rosalyn M. Chapman, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On February 2, 1990, in Los Angeles County Superior Court case no. A981539, a jury convicted petitioner Jimmy Nathan Moody of one count of first degree murder in violation of California Penal Code ("P.C.") § 187(a) (count 1), five counts of attempted murder in violation of P.C. §§ 664/187(a) (counts 2–4, 7 and 8), and two counts of shooting at an inhabited dwelling in violation of P.C. § 246 (counts 5–6), and, as to counts 1 through 4, 7 and 8, the jury found petitioner personally used a firearm in the commission of the offenses within the meaning of P.C. §§ 1203.06(a)(1) and/or 12022.5(a) and inflicted great bodily injury on one of the victims in violation of P.C. § 12022.7. Clerk's Transcript ("CT") 309–19; Petition, Exh. A.[1] On April 24, 1990, the petitioner was sentenced to 31 years to life in state prison. CT 341–44.

The petitioner appealed his convictions and sentence to the California Court of Appeal, CT 345, which affirmed the judgment in an unpublished opinion filed October 30, 1992. Petition, Exh. A. On December 9, 1992, petitioner, proceeding through counsel, filed a petition for review in the California Supreme Court, which denied the petition on January 27, 1993. *See* Petition, Exhs. B–C.

On January 16, 1996, petitioner, again proceeding through counsel, filed a petition for writ of habeas corpus in the Los Angeles County Superior Court, which denied the petition on December 24, 1998, citing *In re Clark*, 5 Cal.4th 750, 765, 21 Cal. Rptr.2d 509, 855 P.2d 729 (1993), and stating that "petitioner provides no justification for the six years delay between his conviction and the filing of this [habeas corpus petition]...." Petition, Exhs. D–E.

On March 27, 2001, petitioner, again proceeding through counsel, filed a habeas corpus petition in the California Court of Appeal, which denied the petition on April 12, 2001. Petition, Exhs. F–G. On May 15, 2001, petitioner, proceeding through counsel, filed a habeas corpus petition in the California Supreme Court, which denied the petition on November 28, 2001, citing *In re Robbins*, 18 Cal.4th 770, 780, 77 Cal.Rptr.2d 153, 959 P.2d 311 (1998), and stating the petition was denied on the mer-

---

1. As to counts 7 and 8, the jury also found the attempted murders were willful, deliberate and premeditated; however, the trial court struck these findings. CT 315–16, 341.

its and for lack of diligence. Petition, Exhs. H–I.

On September 20, 2006, petitioner, proceeding through counsel, filed another habeas corpus petition in the Los Angeles County Superior Court, which denied the petition on March 15, 2007, finding the petition was both untimely and without merit. Petition, Exhs. J–K. Most recently, on July 18, 2007, petitioner, still proceeding through counsel, filed a habeas corpus petition in the California Supreme Court, which denied the petition on February 13, 2008. Petition, Exhs. L–M.

## II

On July 10, 2008, petitioner, proceeding through counsel, filed the pending habeas corpus petition under 28 U.S.C. § 2254, and on September 12, 2008, respondent filed a motion to dismiss the petition, arguing it is untimely. On January 5, 2009, respondent filed an amended supplemental memorandum of points and authorities, and on February 19, 2009, petitioner filed his opposition to the motion to dismiss.

The pending habeas corpus petition raises the following claims:

Ground One—"The prosecutor presented the testimony of witness Moses Tillett without a showing of due diligence. This violated the 5th and 14th Amends. to the U.S. Constitution (Due Process) and violated the 6th Amend. right to confrontation"; and

Ground Two—"There is newly discovered evidence that someone other than Petitioner committed the crime(s)." Petition at 5.

## DISCUSSION

■ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "established a one-year period of limitations for federal habeas petitions filed by state prisoners," *Bryant v. Arizona Attor-*

*ney Gen.*, 499 F.3d 1056, 1059 (9th Cir. 2007), as follows:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review. . . .

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

■ The AEDPA's statute of limitations, which was effective April 24, 1996, did not begin to run until its enactment. *Allen v. Siebert*, 552 U.S. 3, 4, 128 S.Ct. 2, 3, 169 L.Ed.2d 329 (2007) (per curiam); *Carey v. Saffold*, 536 U.S. 214, 217, 122 S.Ct. 2134, 2137, 153 L.Ed.2d 260 (2002). Thus, an inmate whose conviction became final before the AEDPA's effective date, such as petitioner, had one year from the AEDPA's enactment, or until April 24, 1997, to file a federal habeas corpus petition. *Bryant*, 499 F.3d at 1059; *Roy v. Lampert*, 465 F.3d 964, 969 (9th Cir.2006), *cert. denied sub nom., Belleque v. Kephart*, 549 U.S. 1317, 127 S.Ct. 1880, 167 L.Ed.2d 386 (2007). The instant action, however, was not filed until July 10, 2008—more than eleven years after the statute of limitations ran.

■ This Court must now consider whether the statute of limitations was statutorily tolled while petitioner's several applications for collateral relief were pending in the California courts. The petitioner's

first habeas corpus petition was filed in the Los Angeles County Superior Court on January 16, 1996, and was denied with a citation to *In re Clark* and a finding that there was "no justification for the six years delay between [petitioner's] conviction and the filing" of the petition; thus, this habeas petition was not properly filed and it did not toll the limitations period. *See,* e.g., *Siebert,* 128 S.Ct. at 4–5 ("Because Siebert's petition for state post-conviction relief was rejected as untimely by the Alabama courts, it was not 'properly filed' under § 2244(d)(2). Accordingly, he was not entitled to tolling of AEDPA's 1–year statute of limitations."); *Pace v. DiGuglielmo,* 544 U.S. 408, 417, 125 S.Ct. 1807, 1814, 161 L.Ed.2d 669 (2005) ("Because the state court rejected petitioner's ... petition as untimely, it was not 'properly filed,' and he is not entitled to statutory tolling under § 2244(d)(2)."); *Thorson v. Palmer,* 479 F.3d 643, 644 (9th Cir.2007) ("[B]ecause the California Supreme Court denied Thorson's state habeas petition as untimely, Thorson was not entitled to tolling while his untimely petition was pending in state court."). Moreover, since petitioner's other habeas corpus petitions in the California courts were not filed until after the statute of limitations had expired, they neither tolled nor revived the limitations period. *Jiminez v. Rice,* 276 F.3d 478, 482 (9th Cir.2001), *cert. denied,* 538 U.S. 949, 123 S.Ct. 1627, 155 L.Ed.2d 492 (2003); *Green v. White,* 223 F.3d 1001, 1003 (9th Cir.2000). Thus, petitioner is not entitled to statutory tolling of the limitations period, and the statute of limitations expired on April 24, 1997.

■■ Next, this Court must determine whether the limitations period should be equitably tolled. A habeas petitioner is entitled to equitable tolling "only if extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Miles v. Prunty,* 187 F.3d 1104, 1107 (9th Cir.1999) (citation and

internal quotation marks omitted); *Espinoza–Matthews v. People of the State of Cal.,* 432 F.3d 1021, 1026 (9th Cir.2005). The petitioner bears the burden of proving: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace,* 544 U.S. at 418, 125 S.Ct. at 1814; *Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir.2009). Additionally, "the prisoner must show that the 'extraordinary circumstances' were the but-for and proximate causes of his untimeliness." *Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir.2003) (citations and internal quotation marks omitted); *Ramirez,* 571 F.3d at 997.

■■ An actual innocence claim may constitute an "extraordinary circumstance" warranting equitable tolling, *see Souter v. Jones,* 395 F.3d 577, 599 (6th Cir.2005) ("[E]quitable tolling of the one-year limitations period based on a credible showing of actual innocence is appropriate."); *Gibson v. Klinger,* 232 F.3d 799, 808 (10th Cir. 2000) ("Equitable tolling would be appropriate ... when a prisoner is actually innocent ....".), or act as an exception to the statute of limitations. *See United States v. Zuno–Arce,* 339 F.3d 886, 890 n. 5 (9th Cir.2003) (Petitioner's actual innocence claim "is not in itself a constitutional claim, but would serve only to remove the timeliness bar so that claims may be heard on the merits."), *cert. denied,* 540 U.S. 1208, 124 S.Ct. 1483, 158 L.Ed.2d 132 (2004). In either event, "[t]o be credible, [an actual innocence] claim requires petitioner to support his allegations ... with new reliable evidence ... that was not presented at trial [,]" and to "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo,* 513 U.S. 298, 324, 327, 115 S.Ct. 851, 865, 867, 130 L.Ed.2d 808 (1995); *Calderon v. Thompson,* 523 U.S. 538, 559, 118 S.Ct.

1489, 1503, 140 L.Ed.2d 728 (1998); *Griffin v. Johnson,* 350 F.3d 956, 963 (9th Cir.2003), *cert. denied,* 541 U.S. 998, 124 S.Ct. 2039, 158 L.Ed.2d 510 (2004). Moreover, " 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998).

The petitioner claims "he is entitled to ... equitable tolling [of the statute of limitations] pursuant to [*Schlup* ]" because he is actually innocent of the crimes of which he was convicted. Opposition at 2:13–14. An understanding of the facts and circumstances underlying petitioner's convictions is helpful for proper consideration of petitioner's claim. The California Court of Appeal, in affirming petitioner's judgment, determined the following facts and circumstances underlying petitioner's offenses:

On the evening of December 30, 1988, Katherine Miller was at home with her family, the members of which were seated in the living room, when she heard shots fired in the direction of her residence. She telephoned the police. After the police arrived, she noticed the front window had been broken, there were bullet holes in the ceiling, the wall and the coffee table and articles on the coffee table had been shattered. Queen Feaster also was at home with 2 of her children when she heard gunfire; approximately 13 or 14 shots were fired. A bullet came through the side window of her residence and hit a counter. She also telephoned the police. [¶] Jimmy Lee Jones (Jones), Moses Tillett (Tillett), Bryan Cass (Cass) and Raymond Smith (Smith) had been "hanging out" for most of December 30, 1988 on the 200 block of West 84th Street, near Broadway. Smith, a member of the Maui Boys Crips gang, [FN 1] had been selling rock cocaine. At approximately 5:30 p.m., a red automobile had driven past and the occupants had yelled, "Blood."

[FN 1] Jones and Tillett each denied being a gang member, but each identified his companions of December 30 as members of the Maui Boys or East Coast Crips.

At approximately 8:30 p.m., a gray Chevrolet Nova containing three men drove into the area. The Nova stopped near a street light, made a U-turn and drove back toward Jones, Tillett, Cass and Smith. The Nova then pulled into the middle of the street and stopped. Smith began walking toward the Nova, whereupon the driver, who was wearing a black or burgundy baseball cap, and the occupant of the rear seat began shooting at Smith and his companions. Jones and Tillett were standing approximately 25 feet from the Nova when the shooting began. They fell to the ground and ducked behind a blue van. Smith began running toward the curb after the first shot was fired; he had nearly reached the van when he fell to the ground. [1] Tillett only saw the driver fire shots from what appeared to be a nine millimeter handgun; he heard approximately nine shots. As he ducked behind the van, he also heard what appeared to be a .22 caliber shotgun. Jones heard more than six shots, which sounded as if they were fired by a nine millimeter gun. [¶] Jones and Tillett both identified [petitioner] as the driver of the Nova. Jones lived on the 200 block of West 84th Street; he had seen [petitioner] once before in that neighborhood. Jones was sufficiently familiar with gangs to know that Bloods wear red and Crips wear blue or black. When Jones was questioned by the police shortly after the shooting, he stated that he could not identify anyone in the Nova. He was afraid to make an identification. Although he subsequently did

so, he remained afraid; he had moved out of state due to his fear. Tillett and Jones separately picked a photograph of [petitioner] from a photographic display, identifying him as the shooter. [¶] Smith died of a gunshot wound which injured his right kidney, liver and heart. A copper-jacketed bullet was removed from Smith's clothing. He was holding money and rock cocaine at the time of his death. [¶] During his investigation on December 30, 1988, Los Angeles Police Officer Richard Simmons collected 21 bullet casings from the area of the shooting. He found 16 casings from a 9 millimeter handgun and 5 from a .25 caliber gun. All of the casings probably were ejected from semiautomatic weapons. A casing normally would eject approximately 10 feet from these weapons. [¶] On January 1, 1989, at approximately 6:00 or 6:30 p.m., Leon Howard (Howard), Conoleus Hubbard (Hubbard), Eric Polite (Polite) and another individual named Eric left a hamburger stand at the corner of Florence Avenue and Avalon Boulevard. Polite lingered, using the public telephone at the side of the hamburger stand, while his three companions began walking to Howard's home about one block away. [¶] Howard was a member of the East Coast Crips gang, as was the individual known only as Eric, and the neighborhood in which Howard lived was in Crips territory. Howard was wearing a blue cap, while Eric was clad in a blue shirt and light blue corduroy trousers; Hubbard might have been wearing blue. The Mad Swan Bloods and the East Coast Crips have a hostile rivalry. Hubbard and Polite are not associated with any gang and, as it happened, Polite was wearing a red sweater. The color red is associated with Bloods gangs. [¶] While Polite was talking on the telephone, a green Cadillac drove past Polite's three companions. The three occupants, each of whom was wearing a red cap, did a double-take upon seeing the trio. The Cadillac then pulled into the hamburger stand parking lot right in front of Polite, no more than four or five feet away from him. [Petitioner] stepped out of the back seat of the Cadillac, took off his cap and began trotting toward Howard, Hubbard and Eric. The Cadillac drove past the hamburger stand's drive-through window, drove across the street and parked in front of the Avalon Market. [¶] Howard heard someone running up behind him; he turned and saw [petitioner], who was holding his right hand behind his right leg. [Petitioner] stopped and put a burgundy Washington Redskins cap on his head. He then shouted, "Mad Swan Blood," as he brought his right hand out from behind his leg to reveal a gun. Upon seeing the gun, Howard turned and ran. Hubbard also glanced at the individual running up behind them. When he heard the shout of "Mad Swan Blood," he also ran. [¶] [Petitioner] began shooting at the trio. It appeared to Howard that [petitioner] was firing a .22 caliber weapon from a distance of approximately 30 feet. Howard heard two or three shots; Polite saw [petitioner] fire two shots. The first shot was not well-aimed and hit nothing; [petitioner] then took more careful aim and fired again, striking Hubbard in the lower back. The trio continued running until they reached Howard's house, where they telephoned the police and paramedics. Hubbard was hospitalized for approximately one week; surgeons were unable to remove the bullet from his back. [¶] As [petitioner] ran toward the trio walking to Howard's home, Polite ended his telephone conversation and stepped onto the sidewalk to watch. After [petitioner] fired the shots, Polite walked back toward the telephone so [petitioner]

would not realize he had been watching. [Petitioner] walked past Polite and said, "What's Up, Blood?" [Petitioner] then continued walking to the corner, jogged across the street, and stepped into the Cadillac, which then drove away. [¶] On January 13, 1989, Howard was shown an eight-person photographic lineup; he identified a photograph of [petitioner] as the individual who shot at him. On a separate occasion, Polite also identified [petitioner] from the same photographic lineup. [¶] Los Angeles Police Detective Joe Flores has extensive experience with gangs and gang members; he has handled approximately 25 gang murders. He is familiar with the area of 84th Street near Broadway and Main Streets. The eastern portion of the 77th Street Division, in which he works, is Mad Swan Bloods gang territory. The northernmost boundary of the territory is Florence Avenue, while the southernmost is Manchester Boulevard. The territory is bounded on the east by Central Avenue and, generally, on the west by Main Street. [¶] A Bloods gang is associated with the color red, while a Crips gang is associated with the color blue. The East Coast Crips is a very large gang with many subsets, including the Maui Boys Crips. The Crips and the Bloods traditionally have a hostile rivalry. The Mad Swan Bloods are in a unique position, occupying a territory entirely surrounded by Crips gangs. Moreover, Fremont High School, which is in Mad Swan Bloods territory, is attended by many Crips members. It is not uncommon for a rival gang to go into another gang's territory to retaliate for a perceived wrong by shooting; an automobile is the most common mode of transportation for these "invasions." Generally, a drive-by shooting is a group event; retaliation is the purpose of most gang-related violence. It is common for a gang member to call out his affiliation

in connection with such a shooting. In Detective Flores' opinion, the December 30 shooting probably was a gang shooting involving the Mad Swan Bloods. The January 1 shooting was a classic gang shooting. [¶] Given the mobility of gangs through rival territories, members often wish to display their gang colors in a subtle manner. Often, a gang member will wear only one article of clothing in the gang's color, and it may be as inconspicuous as one shoelace. In Detective Flores' opinion, saying "What's up, Blood" to an individual wearing red would indicate the speaker believed the person in red was a fellow Bloods gang member. [¶] In Detective Flores' experience, a handgun or a rifle was the weapon of choice in an attack on a rival gang. Such weapons more often are passed along or sold to other gang members rather than disposed of after they are used in the commission of a crime. Guns move with great fluidity among gangs. [¶] On January 13, 1989, Los Angeles Police Detective Robert A. Jakucs spoke to [petitioner] concerning the December 30 shooting. At the time, Detective Jakucs was not aware that [petitioner] was a suspect in the January 1 shooting. [Petitioner] waived his rights and made a statement. [Petitioner] acknowledged that he had been a member of the Mad Swan Bloods and had been known as Jimbo, but asserted that he had ended that affiliation. He denied any involvement in the December 30 shooting, but he was unable to state where he had been at the time. [¶] Earlier, Detective Jakucs had served a search warrant on [petitioner's] residence. In searching [petitioner's] bedroom, Detective Jakucs found a note in [petitioner's] dresser drawer. The note read, "Give to Lamar to tell Jimbo to take care of the witnesses. Very important. Don't forget." It appeared to be

signed, "Big Dan," and bore the designation, "Module 3301."

Petition, Exh. A at 17–24.

The California Court of Appeal also found petitioner presented the following defense at trial:

[Petitioner] lived with his family in Chino Hills, about 35 miles from Los Angeles. On December 28, 1988, he had taken his automobile to be painted a cream color; consequently, on December 30, his mother drove him to his job at USC–Los Angeles County Medical Center. [Petitioner] met her at her place of employment on Hill Street at 2:30 p.m. Approximately one hour later, she drove him to the bank and then dropped him off at the paint shop to pick up his automobile; according to the shop manager, [petitioner] picked it up between 6:00 and 7:00 p.m. [¶] According to [petitioner], he picked up his automobile at 2:45 p.m. and then visited his girlfriend, Latrice Dosier, in Compton. He left Ms. Dosier's residence at approximately 7:45 p.m. and drove to the home of Norma Franks, arriving at about 8:00 p.m. He remained at the Franks home, visiting with his friend, Leonard Franks, until approximately 11:00 p.m. According to Mrs. Franks, [petitioner] arrived at her home at 7:00 p.m. and remained until 11:00 p.m. [¶] [Petitioner] had nothing to do with the shooting on 84th Street at Broadway. He did not have access to a Chevrolet Nova. [¶] On January 1, 1989, [petitioner] testified he again visited the Franks residence, where he remained overnight. According to Mrs. Franks, he arrived at her home at approximately 6:00 p.m. for New Year's dinner; he left at approximately 11:00 p.m. [Petitioner] was not in the vicinity of Florence Avenue and Avalon Boulevard on January 1.[¶] [Petitioner] visited his girlfriend every day

after work. Three days a week he visited Leonard Franks. Leonard Franks had been a member of the Fruit Town Piru Bloods gang; he was confined to a wheelchair as a result of a shooting by Crips gang members. [Petitioner] knew nothing about the contents of the note seized from his dresser; he did not know how the piece of paper came to be in his drawer.

Petition, Exh. A at 24–25. In rebuttal, the prosecution presented evidence that petitioner "told Detective Jakucs that he spent every evening with his girlfriend until he went home for the night. He went out into the street. He never mentioned visiting the Franks residence." Petition, Exh. A at 25.

■ To support his actual innocence claim, petitioner proffers new evidence regarding both the December 30th killing and the January 1st shooting. Specifically, he proffers the declarations of Moses Tillett, Claudell Hatter, Brandon Hines and Edward Day and an unsworn statement by Marianna Lewis to support his actual innocence claim regarding the December 30th killing, and the declarations of Leon Gilbert Howard, Conoleus Hubbard and Kenneth Crooks to support his claim regarding the January 1st shooting. *See* Opposition at 9:17–14:16. This Court, having reviewed the new evidence, and having considered that evidence in light of the other evidence of record, determines the new evidence does not show "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327, 115 S.Ct. at 865, 867; *Melson v. Allen*, 548 F.3d 993, 1003–04 (11th Cir. 2008), *cert. denied*, —— U.S. ——, 130 S.Ct. 254, 175 L.Ed.2d 173 (2009).

As an initial matter, neither petitioner nor anyone else cogently explains why this new evidence was not proffered earlier than sixteen years after petitioner's trial.[2]

---

**2.** Petitioner was convicted and sentenced in 1990, and he first proffered the new evidence

The petitioner has not provided a reasonable explanation for his sixteen-year delay,[3] and without that explanation, it is clear petitioner has not been "pursuing his rights diligently[.]" *Pace*, 544 U.S. at 418, 125 S.Ct. at 1814; *see also id.* at 419, 125 S.Ct. at 1815 ("Under long-established principles, petitioner's lack of diligence precludes equity's operation."); *Welch v. Carey*, 350 F.3d 1079, 1083 (9th Cir.2003) (en banc) ("Tolling accommodates effort, not inaction."), *cert. denied*, 541 U.S. 1078, 124 S.Ct. 2423, 158 L.Ed.2d 991 (2004). Second, much of the new evidence is only marginally relevant to petitioner's actual innocence claim. For example, none of the declarants states petitioner was not the shooter or identifies another individual as the shooter for either the December 30th killing or the January 1st shooting. Third, none of the new evidence is reliable. *See Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir.2004) ("Because *Schlup* explicitly states that the proffered evidence must be reliable, the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record."), *cert. denied*, 546 U.S. 961, 126 S.Ct. 489, 163 L.Ed.2d 364 (2005). All of the declarants except Hubbard are in prison, where they may be subject to pressure to support petitioner, another inmate, without any practical consequences if they are found to be lying in their declarations.[4] *Cf. Smith v. Baldwin*, 510 F.3d 1127, 1141–42 (9th Cir.2007) (en banc), *cert. denied*, — U.S. —, 129 S.Ct. 37, 172 L.Ed.2d 49 (2008); *United States v. Connolly*, 504 F.3d 206, 214–15 (1st Cir.2007), *cert. denied*, — U.S. —, 128 S.Ct. 1689, 170 L.Ed.2d 359 (2008); *see also United States v. Gonzalez–Gonzalez*, 258 F.3d 16, 22 (1st Cir. 2001) (finding evidence was weak when it depended upon the credibility of convicted felons and those under threat of retaliation for their prior adverse testimony). Addi-

proffered here when he presented his actual innocence claim to the Los Angeles County Superior Court on September 20, 2006. Petition, Exh. J.

3. Petitioner states:

Since his conviction in 1990, Petitioner has been searching for evidence of his innocence, evidence sufficient to set aside the conviction. He has filed petition after petition. He has employed three private investigators who have developed and followed up leads in a diligent fashion.... The investigation moved slowly as it entailed finding individuals who often did not want to be found. Many were in prisons, charged and convicted of other crimes. Many of these individuals were reluctant to talk as well. Affidavits had to be drafted and signed. Much time was consumed by correspondence through the U.S. Mail and the state prison system of California....

Opposition at 6:17–7:20. This argument is not convincing. Although petitioner claims he has filed "petition after petition[,]" he fails to note there were often lengthy gaps of three or more years between petitions, and the new evidence was not presented until 2006. These lengthy delays attest to petitioner's lack of diligence. A glaring example of petitioner's delay is the unsworn interview of Marianna Lewis, who on April 11, 1994, Petition, Exh. J (Exh. T) at 671–73—several years before the statute of limitations began to run—provided a supporting declaration to petitioner. Yet, inexplicably, almost ten years later, on February 12, 2004, petitioner's investigator began the interviews of Lewis that petitioner relies upon here. *See* Petition, Exh. J (Exh. S) at 451–669.

4. For instance, Edward Day states his California Department of Corrections ("CDC") number is H68467. Petition, Exh. J (Exh. Q) at 439. Pursuant to Fed.R.Evid. 201, this Court takes judicial notice of the habeas corpus petition and related documents filed in *Day v. Hall*, CV 02–7026–FMC(CW), which show that on February 19, 1993, Day (CDC no. H68467) was sentenced to state prison for 20 years to life for second-degree murder. Similarly, Crooks admits he is currently imprisoned on "robbery-murder charges." Petition, Exh. J (Exh. P) at 435.

tionally, Lewis has a son in prison, Petition, Exh. J (Exh. S) at 575, 590, and, in any event, her unsworn statements are not competent evidence, and petitioner offers no explanation why Lewis's interview statements were not reduced to a sworn declaration. But most important, the declarations of Tillett and Howard, both of whom to some extent recant their trial testimony, are equivocal and contradicted by other evidence, as discussed below. For all these reasons, the new evidence does not meet the *Schlup* threshold, *Arthur v. Allen*, 452 F.3d 1234, 1246 (11th Cir.2006), *modified by*, 459 F.3d 1310 (11th Cir.2006), *cert. denied*, 549 U.S. 1338, 127 S.Ct. 2033, 167 L.Ed.2d 763 (2007); *Melson*, 548 F.3d at 1003; *see also McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir.2007) (Petitioner does not satisfy *Schlup* standard with new evidence by witness who identified petitioner at trial as the shooter and later recants by stating he could not really identify the shooter since "[r]easonable jurors no doubt could question the credibility of this about face from another inmate and rationally could discount his testimony as nothing more than an attempt to keep from being 'pegged as a rat' for having originally identified [petitioner] as the gunman."), *cert. denied*, —— U.S. ——, 128 S.Ct. 1236, 170 L.Ed.2d 81 (2008), and grounds do not exist to equitably toll the statute of limitations.

### a. Moses Tillett:

At petitioner's trial, the preliminary hearing testimony of Moses Tillett was read into the record since Tillett was unavailable. Reporter's Transcript ("RT") 299:21–311:7, 328:5–353:13. Briefly, Tillett testified that on December 30, 1988, at approximately 9:30 p.m., he was standing with his friends Jones, Cass and Smith

outside a house on West 84th Street when he saw a red car drive past with about five or six black males in it, one or more of whom yelled "Blood" as the car drove off. CT 158–59; RT 328:21–329:20. Later that evening, a gray Nova drove into the neighborhood and parked across the street from Tillett and his friends. CT 159, 166; RT 329:23–330:5, 337:4–338:6. There were four or five males in the car, who talked to someone across the street before pulling out into the middle of the street and firing at Tillett and his friends, striking and killing Smith. CT 159–62; RT 330:6–332:24. Tillett identified petitioner as the driver, stating he had an opportunity to see the driver and would recognize the driver again, CT 161; RT 331:9–332:1, and further testified that the driver was the shooter, firing approximately nine shots from what sounded like a 9–mm. gun. CT 160–62, 171; RT 331:9–332:8, 341:25–342:5.

On February 14, 2005, Tillett, a state inmate,[5] signed a declaration stating:

> [E]ven though I did identify Jimmy Moody[,] I was really unable to make an identification. I identified Jimmy Moody because everyone was saying it was he who shot at us. After the shooting, my friends got together and we concluded it must have been Jimmy Moody as we had heard his relative got beat up and he was probably upset about it. If Moody was the one who shot at us, I did not want him to get away with it. However, *I cannot say whether Jimmy Moody did or did not shoot at us that day.* [¶] At the time, I did not make it clear that I only got a single glimpse of the perpetrator, the man[ ] who fired the gun. I do not think I saw enough of the shooter's face and features to permit an honest and reliable

---

**5.** At the time he signed his declaration, Tillett was confined in North Kern State Prison.

Petition, Exh. J (Exh. L) at 420.

identification. [¶] The only glimpse of the shooter's face was in the muzzle flash of the gun as it fired. I ducked when the gun was fired. I ducked behind a truck in a hail of bullets. I kept my head down and did not look. [¶ ] When the shots were fired, they were fired from the driver's side rear seat of the car. [¶ ] I do recall the shooter wore an Afro or Jheri curl. [¶] I want to make it clear that I did not see Jimmy Moody shoot and kill Raymond Smith on December 30, 1988, or any other date. On the day of the shooting, I had never met Jimmy Moody. [¶] As I reflect on events today, and as I recall the glimpse I got of the shooter, **I do not think I saw enough to identify Jimmy Moody as the shooter that day.**

Petition, Exh. J (Exh. L) at 418–20 (emphasis added).

The Superior Court determined Tillett's declaration was insufficient to grant petitioner habeas relief, finding, inter alia, "it is not clear and unequivocal" and Tillett provided no explanation about why everyone was saying petitioner was the shooter. Petition, Exh. K at 455–56. The Superior Court further found:

Mr. [Tillett] offers no explanation why he is trying to change his testimony after approximately fifteen years. The Court also is concerned that Mr. [Tillett] may be motivated to help [petitioner] because he is also imprisoned in state prison. The passage of time coupled with the weak recantations by Mr. [Tillett] is not evidence which convinces this Court to grant the petition.

*Id.*

As the Superior Court held, Tillett's declaration is equivocal. Tillett does **not** claim petitioner did not shoot at him, but merely states he now "cannot say" petitioner was the shooter. Moreover, Tillett's recantation of his prior identification of petitioner is highly suspicious, *Allen v.* *Woodford,* 395 F.3d 979, 994 (9th Cir.), *cert. denied,* 546 U.S. 858, 126 S.Ct. 134, 163 L.Ed.2d 137 (2005); *see also Haouari v. United States,* 510 F.3d 350, 353 (2d Cir.2007) ("It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.'" (citations omitted)); *United States v. Leibowitz,* 919 F.2d 482, 483 (7th Cir.1990) ("Judges view recantation dimly."), *cert. denied,* 499 U.S. 953, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991); *United States v. Nixon,* 881 F.2d 1305, 1311 (5th Cir.1989) ("The recanting of prior testimony by a witness is ordinarily met with extreme skepticism."); *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir.1980) ("Recantation of testimony given under oath at trial is not looked upon with favor. Indeed, such is generally looked upon with downright suspicion."), *cert. denied sub nom., Hines v. United States,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981), and is not reliable since neither petitioner nor Tillett has offered a cogent explanation why it took Tillett fifteen years to recant. *See Allen,* 395 F.3d at 994 (Witness's "recantation testimony is even more unreliable because his trial testimony implicating [petitioner] is consistent with the other evidence, while his recantation is not."); *Arthur,* 452 F.3d at 1246 § "Exculpatory affidavits 'produced ... at the 11th hour with no reasonable explanation for the nearly decade-long delay' are 'suspect.'" (quoting *Herrera v. Collins,* 506 U.S. 390, 423, 113 S.Ct. 853, 872, 122 L.Ed.2d 203 (1993) (O'Connor, J. concurring))); *Melson,* 548 F.3d at 1003 (same). Nor has Tillett explained how, despite having never met petitioner prior to the shooting, he was able to identify petitioner's photograph as the shooter shortly after Smith's murder, RT 345:21–350:23, and at the preliminary hearing, and Tillett's preliminary hearing testimony was corroborated by Jones's trial testimony, RT 103:27–107:7, 123:22–125:13, *128:7–10,* 345:21–350:23,

rendering the recantation even more unreliable. *See Allen,* 395 F.3d at 994 (Witness's "recantation testimony is even more unreliable because his trial testimony implicating [petitioner] is consistent with the other evidence, while his recantation is not.").

### b. Claudell Hatter:

On December 13, 2005, Claudell Hatter, another state inmate,[6] signed a declaration identifying "several discrepancies in the statement the police report indicate[s][he] made[,]" and further stating he was half a block away when the shooting occurred and could not identify the shooter although he "saw an unidentified person sitting on the ledge of [a car's] window, shooting over the top[ ] of the car either at [Smith] or in his direction." Petition, Exh. J (Exh. O) at 431–33.

The Superior Court found Hatter's declaration to be only "marginally" relevant since Hatter "did not provide significant evidence linking petitioner to the shootings." Petition, Exh. K at 692. The Court agrees. Since Hatter did **not** testify at petitioner's trial, and because his declaration does not exonerate petitioner, Hatter's declaration clearly is insufficient to satisfy the *Schlup* threshold.[7]

### c. Brandon Hines:

On September 13, 2005, Brandon Hines, another state inmate,[8] signed a declaration stating he had a gun pulled on him by some Swans gang members in a small primer gray car similar to a Nova, and that petitioner was not in the car. Petition, Exh. J (Exh. R) at 443–49. Hines also states petitioner "was not in the car on 84th St. in front of the house [where] Raymond was killed." *Id.* at 448. Additionally, Hines states he "heard" there were five "Jimbos" who were Swans gang members. *Id.* at 447–48.

The Superior Court found Hines's declaration was of "marginal" relevance and this Court agrees since, among other things: Hines's declaration is vague about when Hines was confronted by Swans gang members; whether there were multiple gang members named "Jimbo" has little relevancy to petitioner's claim of innocence; and assuming *arguendo* Hines's reference to "Raymond" means Smith, it is not clear that Hines has personal knowledge that petitioner "was not in the car on 84th St. in front of the house [where] Raymond was killed." Petition, Exh. K at 692. Thus, Hines's declaration, when considered with the entirety of the evidence, is insufficient to satisfy the *Schlup* threshold.

### d. Edward Day:

On February 16, 2005, Edward Day, another state inmate,[9] signed a declaration stating that on the night Smith was killed, he saw:

> a girl named Mariana talking to some male Blacks in a gray car. There were three male Blacks in the car and they were gang bangers.... None of the

---

**6.** At the time he signed his declaration, Hatter was confined in Pelican Bay State Prison. Petition, Exh. J (Exh. H) at 431.

**7.** Petitioner argues Hatter's declaration is significant because "it established there were at least two Jimbos [petitioner's moniker] living in the relevant neighborhood." Opposition at 13:9–18. But Hatter's declaration does **not** do that; rather, it merely states that Hatter "did not tell the police that [he] knew 'Jimbo'

(Jimmy Moody) as 'Sargent' because [he] did not know him by that name. [He] knew him as 'Jimbo.'" Petition Exh. J (Exh. O) at 433.

**8.** At the time he signed his declaration, Hines was confined in Old Folsom State Prison. Petition, Exh. J (Exh. R) at 443.

**9.** At the time he signed his declaration, Day was confined in Ironwood State Prison. Petition, Exh. J (Exh. Q) at 439.

Black males in the car were [petitioner.] ... I stayed and watched things for 15 to [sic] minutes and then I left. . . . **I did not see the shooting.** ... I knew that [petitioner] did not do the shooting. I had seen the men in the car and [petitioner] was not in the car. The shooter definitely shot from the gray car I saw that night on 84th Street.

Petition, Exh. J (Exh. Q) at 439–41 (emphasis added).

Day's declaration merely states he did **not** see Smith's killing, although Day also **speculates** that the shooter was in the gray car and petitioner was not in that car. Since Day did not see the shooting, he cannot contradict the eyewitness testimony of those witnesses who did see the shooting and identified petitioner, *McCray*, 499 F.3d at 574, and his declaration does not satisfy the *Schlup* threshold.

### e. Marianna Lewis:

Marianna Lewis did not testify at petitioner's trial. However, in 1994, she signed a declaration for petitioner supporting his state habeas corpus petition, Petition, Exh. J (Exh. T) at 671–73, and in 2004, James Richardson, a private investigator acting on petitioner's behalf, interviewed Lewis on several occasions. Petition, Exh. J (Exh. S) at 451–669. Petitioner now proffers the unsworn transcript of Lewis's interviews to support his actual innocence claim. Opposition at 9:20–11:10. In the interviews, Lewis stated that on the night Smith was murdered: she and her cousin Regina Hillman were leaving her residence on 84th Street when a light gray vehicle driven by an individual named "Big Tweet"[10] drove up and asked her help in finding an address; the gray vehicle then drove away and turned around before "Big Tweet" shot at Smith and his friends; Smith actually fired at the gray vehicle first, with "Big Tweet" returning fire; before Smith's murder, "Big Tweet" had shot at and tried to kill Lewis, but she had not told the police about this attempt on her life; Lewis grew up around petitioner and knew him, and petitioner was not in the light gray vehicle when "Big Tweet" shot and killed Smith; and "Big Tweet" and petitioner looked like brothers and "if you [saw them] from a distance and you really didn't know [them], you would mistake" them for each other. Petition, Exh. J (Exh. S) at 451–669.

Lewis's interview statements, which are not under oath or penalty of perjury, are hearsay and inherently unreliable. Fed. R.Evid. 801–07; *see also United States v. Godinez*, 110 F.3d 448, 456 (7th Cir.1997) (" 'The basis for excluding hearsay evidence is the notion that statements made while not under oath and while not subject to cross-examination are inherently unreliable.' " (citation omitted)). This is especially true here because Lewis's recent unsworn statements contradict key parts of the declaration she gave under penalty of perjury on April 11, 1994, at which time she stated:

> On December 30, 1988, I was standing in front of my grandmother's home at 200 West 84th Street when a silver or grey colored Chevy Nova automobile approached me. There were three or four young men in this automobile, ***none of whom I had ever seen before.*** The driver asked me if I knew where a particular address in the 200 block of 84th Street was. Jimmy Moody was definitely not in this automobile.

Petition, Exh. J (Exh. T) at 671–73 (emphasis added). Moreover, there is no evi-

---

**10.** At the time of Lewis's interviews, "Big Tweet" was apparently in prison. *See,* e.g.,

Petition, Exh. J (Exh. S) at 642.

dence corroborating Lewis's unsworn statements, and petitioner has not given a credible reason for waiting until 2004 to re-interview Lewis.[11] *See, e.g., Malcom v. Payne,* 281 F.3d 951, 963 (9th Cir.2002) (tolling inappropriate when petitioner learned of alleged recantation in December 1996, but failed to file her federal habeas corpus petition until July 1999); *Baker v. Norris,* 321 F.3d 769, 772 (8th Cir.) (petitioner not entitled to equitable tolling due to her alleged actual innocence when petitioner waited fifteen years to pursue this claim), *cert. denied,* 539 U.S. 918, 123 S.Ct. 2283, 156 L.Ed.2d 135 (2003); *Whitley v. Senkowski,* 567 F.Supp.2d 490, 496 (S.D.N.Y.2008) ("[R]easonable diligence in pursuing an actual innocence claim is a prerequisite to equitable tolling of the AEDPA statute of limitations."); *Brown v. McKee,* 232 F.Supp.2d 761, 769 (E.D.Mich. 2002) ("In the present case, petitioner has offered this Court no reasons why it took him over ten years after being convicted and sentenced on this crime to obtain the affidavits from [witnesses].... Because petitioner has not pursued his claims with due diligence, he is not entitled to equitable tolling of the one year limitations period pursuant to an actual innocence exception."). Thus, Lewis's unsworn interview statements, when considered with all the other available evidence, do not satisfy the *Schlup* requirements.

### f. Leon Gilbert Howard:

Leon Gilbert Howard, an East Coast Crips gang member, testified at petitioner's trial that at about 6:00 or 6:30 p.m. on January 1, 1989, he, Hubbard, and Eric left a hamburger stand on Florence and Avalon and were walking toward Howard's house, which was one block away, when petitioner, who was wearing a burgundy hat, ran up from behind them with his right hand behind his leg, screaming "Mad Swan Blood" and opening fire and hitting Hubbard as they ran away. RT 176:5–185:7. A fourth friend, Polite, stayed at the hamburger stand talking on the phone. RT 177:27–178:4. Howard had never seen petitioner before the shooting occurred, RT 182:23–27, and identified him as the shooter from a photographic line-up. RT 187:14–190:13. Howard testified he had no doubt petitioner was the shooter. RT 190:15–19. Hubbard testified similarly about the events surrounding his shooting but was unable to identify the shooter. RT 217:17–225:10.

Polite testified that on January 1st, at approximately 6:00 or 6:30 p.m., he was on the telephone at Lucky Tom's hamburger stand at the corner of Florence and Avalon when the three friends he had eaten with—Howard, Hubbard, and Eric—were walking up the street as a green Cadillac pulled up in front of Polite with three men wearing red hats, and petitioner jumped out of the car, followed Polite's friends, pulled a gun, yelled "Mad Swan Blood" and opened fire, shooting Hubbard. RT 231:3–237:26, 238:13–21, 239:14–22. Polite, who happened to be wearing a red sweater at the time, stated he saw the events because he was standing on the sidewalk, but before petitioner could turn and see Polite standing there, Polite turned around and went back to the phone, with petitioner casually walking by Polite and saying "What's up Blood?" RT 237:27–238:10,

---

11. Petitioner explains the 2004 interview by stating Lewis "was motivated to tell her story only because her grandmother, who had recently passed (which was in 2004), had pushed her to tell the truth so an innocent man (Jimmy Moody) could be released." Opposition at 9:25–10:1. However, this explana-

tion is not credible since Lewis told "her story" 10 years earlier in the 1994 declaration. Moreover, as noted above, petitioner does not explain why Lewis's interview statements were not reduced to a sworn declaration.

238:22–239:4. Polite testified he had a good opportunity to observe petitioner after the shooting because petitioner walked right by him. RT 239:5–22. Polite, who had never seen petitioner before the shooting, was absolutely positive about his identification of petitioner. RT 239:23–240:2. Polite also testified the lighting was very bright where he saw petitioner, and he had no trouble seeing petitioner. RT 240:3–10. Polite identified petitioner as the shooter from a photographic lineup. RT 243:8–245:1.

On February 2, 2005, Howard, a state inmate,[12] signed a declaration stating, in pertinent part:

> After the shooting, I was informed [petitioner] was a member of a "Blood" gang and the "Blood" gang was responsible for the shooting. "Bloods" were my enemy. This fact influenced my identifying [petitioner] as the man who shot Conoleus Hubbard to the police and in sworn testimony. This is the only reason I identified [petitioner]. He was not the shooter. I lied in statements to the police and in sworn testimony. When I identified [petitioner] to the police, it was a lie. When I identified him in court, it was also a lie. . . . The lighting was not very good at the time of the shooting. The sun was going down and the light was fading fast. Seeing facial features was difficult, perhaps not possible. **I did not see the shooter**. . . . **I did not see very much.** I did not tell the truth when I said and testified that [petitioner] was the shooter. To my knowledge, [petitioner] was not present at the shooting.

Petition, Exh. J (Exh. M) at 423.

 The Superior Court found Howard's declaration to be unreliable and not credible, stating:

The alleged recantation . . . is not convincing because it is contradictory ("I didn't see who the shooter was, but it definitely wasn't Jim Moody"), offers no explanation as to why [petitioner] was picked out from all the members of the "Swan Blood Gang," . . . Mr. Howard claims that he picked out [petitioner] because he was [a] blood gang member and [Howard] wanted to get retribution against the blood gang. Since all of the persons in his six-pack were blood gang members, why didn't he pick someone else other than [petitioner]. The odds are one of six to pick [petitioner] as the shooter and the fact that his claim is being made fifteen years after the events. The Court also notes that Mr. Howard is housed at Pelican Bay Prison and may be motivated to help a fellow inmate because of his own present predicament.

Petition, Exh. K at 456. Howard's declaration clearly recants his trial testimony, and as noted above, such recantation is highly suspicious, *Allen*, 395 F.3d at 994; *Haouari*, 510 F.3d at 353, especially when the declaration is not consistent with the trial evidence presented, including the eyewitness testimony of Eric Polite, *Allen*, 395 F.3d at 994, especially since Howard fails to explain why he identified petitioner as the shooter in a photographic line-up, rather than anyone else when he had never seen petitioner before the shooting. RT 182:23–27, 187:14–190:13. Thus, Howard's declaration is not reliable, and it does not meet the *Schlup* threshold.

### g. Conoleus Hubbard:

Hubbard states in his declaration that "Eric Polite could not have seen the shooting from where he was in the phone booth.

---

**12.** At the time he signed his declaration, Howard was confined in Pelican Bay State Prison. Petition, Exh. J (Exh. M) at 422.

There was a bank located next to *Jim Dandy's*. Polite would have had to come out of the phone booth, walk across to Avalon, and down the street to have seen what occurred." Petition, Exh. J (Exh. N) at 428. Similarly, Howard stated in his declaration that Polite "perjured himself too. He lied under oath. He was not even there. He was back at the hamburger stand on the telephone and too far away to see the shooter or the shooting. He was at least a block away." Petition, Exh. J (Exh. M) at 423.

The Superior Court found both Hubbard's and Howard's statements about Polite to be unreliable, Petition, Exh. K at 456–57, and this Court agrees. Neither Hubbard nor Howard accounted for Polite's testimony that he moved from the telephone booth to the sidewalk when he saw the shootings, nor do they address Polite's testimony that petitioner spoke directly to Polite, offering him the opportunity to observe petitioner at close range. Moreover, neither Howard nor Hubbard addresses the undisputed fact that they were walking, and then running away, from Polite when the shooting started. Thus, Hubbard's and Howard's declarations, when considered with the other evidence, do not satisfy the *Schlup* threshold.

#### h. Kenneth Crooks:

On December 13, 2005, Kenneth Crooks, a state inmate,[13] signed a declaration stating there were two "Jimbos" who were 24 Swans gang members. Petition, Exh. J (Exh. P) at 435–37. However, as discussed above, this evidence is not relevant to petitioner's claim of actual innocence and does not satisfy the *Schlup* threshold.

In conclusion, this Court, considering petitioner's new evidence in light of the other evidence of record, cannot say "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324, 327, 115 S.Ct. at 865, 867; *Melson*, 548 F.3d 993, 1003–04. Therefore, petitioner has not met his burden to show grounds exist to equitably toll the statute of limitations based on his claim of actual innocence, and the habeas corpus petition is determined to be untimely.[14]

### RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) entering Judgment dismissing the petition and action as untimely.

DATE: September 14, 2009.

---

13. At the time he signed his declaration, Crooks was confined at the High Desert State Prison. Petition, Exh. J (Exh. P) at 435.

14. To the extent petitioner contends dismissal of his habeas corpus petition would violate the Suspension Clause, his claim is without merit. *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir.), *cert. denied*, 540 U.S. 924, 124 S.Ct. 328, 157 L.Ed.2d 224 (2003); *Green*, 223 F.3d at 1003–04.